BY FAX

1 | CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
   Edward D. Chapin, Esq. (SBN 053287)
2    Francis A. Bottini, Jr., Esq. (SBN 175783)
   Douglas J. Brown, Esq. (SBN 248673)
3 | 550 West "C" Street, Suite 2000
   San Diego, California 92101
4 | Tel: (619) 241-4810
   Fax: (619) 955-5318
5

6 | Attorneys for Plaintiffs

7

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11 | DAVE LUCIA,                          )  No.
                                          )
12 |              Plaintiff               )  SHAREHOLDER DERIVATIVE
                                          )  COMPLAINT FOR VIOLATION OF
13 |     vs.                              )  SECTION 14(A) OF THE SECURITIES
                                          )  EXCHANGE ACT OF 1934 AND FOR
14 | LAURENCE M. BAER, EDWARD A.          )  BREACH OF FIDUCIARY DUTY
   BLECHSCHMIDT, JOHN J. GILBERT,         )
15 | ROBERT M. LEA, MICHAEL J. MENDES,    )
   JOSEPH P. SILVEIRA. STEVEN M. NEIL,    )
16 | GLEN C. WARREN, JR., RICHARD G.      )
   WOLFORD, AND ROBERT J. ZOLLARS,        )
17 |                                      )  DEMAND FOR JURY TRIAL
                                          )
18 |              Defendants.             )
                                          )
19 |                                      )
                                          )
20 | --- and ---                          )
                                          )
21 | DIAMOND FOODS, INC.,                 )
                                          )
22 |                                      )
                                          )
23 |              Nominal Defendant       )
                                          )

24

25

26

27

28



cV11 6417

JSC

FILED
DEC 19 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

**SUMMARY OF ACTION**

1. This is a shareholder derivative action brought on behalf of Nominal Defendant Diamond Foods, Inc. ("Diamond" or the "Company") and against the Company's directors and officers relating to breaches of fiduciary duty and violation of Section 14(a) of the Securities Exchange Act of 1934 committed by defendants between December 9, 2010 and the present (the "Relevant Period").

2. During the Relevant Period, defendants breached, and continue to breach, their fiduciary duties as officers and/or directors of Diamond by failing to ensure that the Company maintained adequate internal controls and by causing the Company to make false and misleading statements concerning the Company's current and future financial condition, in violation of state law and the federal securities laws.

3. The defendants' breaches of fiduciary duty have caused the Company to be unable to timely file its financial statements, necessitated an expensive and time-consuming internal investigation at the Company, imperiled the Company's $2.35 billion acquisition of the Pringles division of Procter & Gamble, caused analysts such as Jeffries to slash their price target for the Company's stock, and tarnished the Company's reputation with shareholders and the investment community. The Company's proposed acquisition of Pringles is a key acquisition for Diamond since, if completed, it would double Diamond's annual revenues.

4. Diamond had planned to assume $850 million in debt from Pringles, and that may rise by as much as $200 million depending on Diamond's stock price, pursuant to the Agreement and Plan of Merger between Diamond and Procter & Gamble announced on April 5, 2011. Thus, Defendants had a strong motive to maintain Diamond's stock price at inflated levels until the acquisition of Pringles was completed.

5. On December 15, 2011, Diamond Foods announced that it had been notified the preceding day that it had received a formal order of investigation from the United States Securities and Exchange Commission ("SEC") relating to whether the Company violated accounting rules in connection with payments made to walnut growers. Most SEC investigations are "informal." Formal investigations are more serious and more rare.

SHAREHOLDER DERIVATIVE COMPLAINT                                                      - 1 -

6.     In response to the revelation of the formal SEC investigation, the Company's stock declined and Jefferies downgraded its rating on the stock to hold from buy and cut its price target to $27 from $46. Forbes published an article on December 15, 2011 noting that "The stock has been hit with staggering losses in recent months, as investigations into 'momentum payments' made to some of the company's vendors has postponed an important acquisition of Pringles from Procter & Gamble."   The Forbes article quoted Jeffries as stating: "In our view, the announced SEC investigation creates too much of an overhang with uncertain timing and increases the risk that the Pringles deal will be terminated," and that Jefferies was taking a neutral stance until there is more clarity on the matter.

7.     Meanwhile, Procter & Gamble spokesperson Jennifer Chelune stated on December 15, 2011 that "P&G's commitment to the transaction is predicated on the favorable resolution of all current investigations."

8.     Diamond shares had previously tumbled on November 23, 2011 after CNBC reported that company director Joseph Silveira committed suicide on Nov. 15, 2011. Silveira had served on the audit committee, which is investigating the wrongdoing alleged herein.  Silveira had recused himself from its investigation.

9.     During the Relevant Period, defendants caused the Company to misrepresent Diamond's current financial condition and prospective financial results, including but not limited to: (a) reported earnings and expenses incurred during the Company's fiscal year 2011; (b) fiscal 2011 projected revenue and earnings and the timing thereof; and (c) overall shareholder value related to a proposed acquisition of The Procter & Gamble Company's ("P&G") Pringles business, which was originally scheduled to close in December 2011 but which has now been delayed, and is in jeopardy of closing, due to Defendants' breaches of fiduciary duty.

10.    During the Relevant Period, the Company's stock traded at artificially inflated prices due to Defendants' wrongdoing, reaching a high of $92.47 on September 20, 2011.

11.    On November 1, 2011, however, the Company's stock price plummeted 17% to close at $52.79 per share on November 2, 2011, down from a close of $64.12 per share on November 1, 2011, on massive trading volume after Diamond issued a press release announcing that the Audit

1     Committee of the Board of Directors was conducting an internal investigation into payments made to

2     walnut growers in September 2011 and the accounting for such payments. In addition, the Company

3     stated that in light of the accounting investigation, the acquisition of P&G's Pringles business

4     scheduled to close in December 2011 would be delayed to mid-2012.

5         12.     On November 5, 2011, *Barron's Online* had published an article entitled "Getting to

6     the Nut of the Problem." The article discussed in detail the Company's September 2011

7     "momentum payment" to walnut growers and suggested that the Company may have overstated its

8     fiscal 2011 financial results.

9         13.     On November 7, 2011, following these disclosures, Diamond's stock price continued

10    to decline on substantial trading volume, falling to a close of $39.09 per share, a 15% decline from

11    its Friday, November 4, 2011 close of $46.40 per share.

12         14.     On December 12, 2011, the Individual Defendants caused Diamond to file a press

13    release and Form 8-K stating that the Company would be unable to timely file its quarterly financial

14    statements. In the press release, the Company stated that: "Diamond expects to receive a notice of

15    deficiency from the Nasdaq Listing Qualifications Department, indicating that Diamond is not in

16    compliance with Nasdaq Listing Rule 5250(c)(1)."

17                    **JURISDICTION AND VENUE**

18         15.     The claims asserted herein arise in part under §14(a) of the Exchange Act.

19    Jurisdiction is conferred by the Exchange Act, and supplemental jurisdiction over Plaintiff's state

20    law claims is conferred by 28 U.S.C. §1367.

21         16.     Venue is proper pursuant to the Exchange Act. Diamond's headquarters are located

22    in San Francisco, California, and false statements were made in this District.

23         17.     The Court has jurisdiction over each named defendant because such defendants are

24    either corporations which conduct business in and maintain offices in this District or individuals who

25    have sufficient minimum contacts with California so as to render the exercise of jurisdiction by this

26    Court permissible.

27         18.     A substantial portion of the transactions and wrongs complained of herein, including

28    Defendants' primary participation in the wrongs alleged herein, occurred in this District. Diamond's

1 | headquarters are located in San Francisco, California, one or more of the individual defendants
2 | reside in San Francisco, and the acts giving rise to the violations complained of occurred in this
3 | District.

4 | ## THE PARTIES

5 |     19.    Plaintiff Dave Lucia is a current shareholder of Diamond Foods and has continuously
6 | held Diamond common stock during the entire Relevant Period. Plaintiff first acquired his Diamond
7 | common stock on June 3, 2008 and has continuously held the shares since that time. Mr. Lucia is a
8 | citizen of the State of Colorado.

9 |     20.    Defendant Diamond is a Delaware corporation with its principal place of business at
10 | 600 Montgomery Street, Suite 1300, San Francisco, California 94111. Diamond sells snack
11 | products to global, national, regional and independent grocery, drug and convenience store chains, as
12 | well as to mass merchandisers and club stores. Defendant Diamond maintains its corporate
13 | headquarters in San Francisco, California. Diamond is a citizen of the States of Delaware and
14 | California.

15 |     21.    Defendant Michael J. Mendes ("Mendes") was, at all relevant times during the
16 | Relevant Period, Chairman of the Board of Directors and Chief Executive Officer of the Company,
17 | and signed the Company's September 15, 2011 Form 10-K filed with the SEC. Mendes is a citizen
18 | of the State of California. Mr. Mendes has served as Diamond's President and Chief Executive
19 | Officer since 1997. Mr. Mendes joined Diamond in 1991 and served as Diamond's Vice President of
20 | International Sales and Marketing prior to being appointed as Diamond's Chief Executive Officer.
21 | Mr. Mendes served as Manager of International Marketing of the Dole Food Company from 1989 to
22 | 1991.

23 |     22.    Defendant Steven M. Neil ("Neil") has served as Diamond's Executive Vice
24 | President, Chief Financial and Administrative Officer since March 2008. In addition, Mr. Neil has
25 | served on the Diamond Board since 2005. Prior to joining Diamond, Mr. Neil was Executive Vice
26 | President and Chief Financial Officer of The Cooper Companies, Inc., a company that manufactures
27 | specialty healthcare products, from April 2007 until March 2008. From 2005 to April 2007, Mr. Neil
28 | was Vice President and Chief Financial Officer of The Cooper Companies. From 2003 to 2005,

SHAREHOLDER DERIVATIVE COMPLAINT - 4 -

1  Mr. Neil served as Executive Vice President, Chief Financial Officer and Secretary of Ocular

2  Sciences, Inc., a contact lens company. From 1997 to 2003, Mr. Neil was Executive Vice President,

3  Finance, Chief Financial Officer, Treasurer and Secretary of Sola International, a marketer of

4  eyeglass lenses. Mr. Neil holds a B.A. from the University of California, Santa Barbara, and an

5  M.B.A. from the Anderson School of Management at the University of California, Los Angeles.

6  Neil is a citizen of the State of California.

7       23.     Defendant Laurence M. Baer is a director of the Company and member of its

8  Compensation Committee and Nominating and Corporate Governance Committee. He has been a

9  director of the Company since 2005. Baer is a citizen of the State of California.

10      24.     Defendant Edward A. Blechschmidt is a director of the Company and member of its

11  Audit Committee. He has been a director of the Company since 2008. Blechschmidt is a citizen of

12  the State of Pennsylvania.

13      25.     Defendant John J. Gilbert is a director of the Company. Gilbert is a citizen of the

14  State of California. Mr. Gilbert, 68, has served as a director of Diamond since 2005 and as

15  Diamond's Chairman Emeritus since January 2010. He served as the Chairman of the Diamond

16  Board from 2005 to January 2010 and was Chairman of the Board of Diamond's predecessor

17  company, Diamond Walnut Growers, from 1996 to 2005. Since 1983, Mr. Gilbert has been the

18  owner and President of Gilbert Orchards and Rio Oso Groves, Inc., each of which is a family

19  corporation focusing on walnuts. Mr. Gilbert holds a B.S. from California Polytechnic State

20  University, San Luis Obispo.

21      26.     Defendant Joseph P. Silveira was a director of Diamond and member of its Audit

22  Committee during the Relevant Period and up until on or about November 15, 2011, when he died.

23  Silveira had served as a director of Diamond since 2005 and was a member of the Board of Directors

24  of Diamond's predecessor company, Diamond Walnut Growers, from 2002 to 2005. Mr. Silveira

25  also served on the Board of Valley Fig Growers from 1992 to 2004, an agricultural cooperative, and

26  while on that Board, he also served on the Board of Directors of Sun Diamond, a master cooperative

27  organization that included Diamond Walnut Growers. Since 1994, Mr. Silveira has served as

28  President of Farmland Management Services, Inc., an agricultural services company, directing

1 property acquisitions, operations, leases and sales on behalf of clients including large institutional

2 investors. Mr. Silveira held a B.S. from California Polytechnic State University, San Luis Obispo.

3 Silveira approved the Company's 2001 Form 10-K and the September 26, 2011 Proxy Statement

4 relating to the merger between Diamond and the Pringles division of P&G.

5     27.     Defendant Glen C. Warren, Jr. is a director of the Company and member of its

6 Compensation Committee and Nominating and Corporate Governance Committee. Warren is a

7 citizen of the State of Colorado.

8     28.     Defendant Richard G. Wolford is a director of the Company and member of its Audit

9 Committee. Wolford is a citizen of the State of California.

10     29.     Defendant Robert J. Zollars is a director of the Company and member of its Audit

11 Committee, Compensation Committee and Nominating and Corporate Governance Committee.

12 Wolford is a citizen of the State of California.

13     30.     Defendant Robert M. Lea has served as a director of Diamond since 2005 and was a

14 member of the Board of Directors of Diamond's predecessor company, Diamond Walnut Growers,

15 from 1993 to 2005. Since 2004, Mr. Lea has practiced law as a solo practitioner with the Law

16 Offices of Robert Lea, which he founded. During 2004, Mr. Lea served as the Managing Partner of

17 Lea and Shepherd, a law firm. From 1984 to 2003, Mr. Lea was a partner of the law firm Lea &

18 Arruti. Mr. Lea holds a B.A. from the University of California, Davis and a J.D. from the University

19 of California, Berkeley, School of Law (Boalt Hall). Mr. Lea is a citizen of the State of California.

20     31.     The individual defendants identified above are referred to herein as the "Individual

21 Defendants."

22                            **CONTROL PERSONS**

23     32.     As officers, directors and controlling persons of a publicly held company whose

24 common stock was and is traded on the NASDAQ and who is governed by the provisions of the

25 federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate

26 and truthful information with respect to the Company's financial condition, performance, growth,

27 operations, financial statements, business, markets, management, earnings and present and future

28 business prospects, and to correct any previously issued statements that had become materially

1  misleading or untrue, so that the market price of the Company's stock would be based upon truthful

2  and accurate information. The Individual Defendants' misrepresentations and omissions during the

3  Relevant Period violated these specific requirements and obligations.

4      33.    The Individual Defendants participated in the drafting, preparation, and/or approval

5  of the various public SEC filings, shareholder and investor reports and other communications

6  complained of herein and were aware of, or recklessly disregarded, the misstatements contained

7  therein and omissions therefrom, and were aware of their materially false and misleading nature.

8  Because of their Board membership and/or executive and managerial positions with Diamond, each

9  of the Individual Defendants had access to the adverse undisclosed information about Diamond's

10  financial condition and performance as particularized herein and knew (or recklessly disregarded)

11  that these adverse facts rendered the positive representations made by or about Diamond and its

12  business or adopted by the Company materially false and misleading.

13      34.    The Individual Defendants, because of their positions of control and authority as

14  officers and/or directors of the Company, were able to and did control the content of the various SEC

15  filings, press releases and other public statements pertaining to the Company issued during the

16  Relevant Period, including but not limited to the 2001 Form 10-K and the September 26, 2011 Proxy

17  Statement. Each Individual Defendant was provided with copies of the documents alleged herein to

18  be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

19  prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants

20  is responsible for the accuracy of the public reports and releases detailed herein and is therefore

21  primarily liable for the representations contained therein.

22                              **BACKGROUND**

23      35.    Diamond was incorporated in Delaware in 2005 as the successor to Diamond Walnut

24  Growers, Inc., a member-owned California agricultural cooperative association. In July 2005,

25  Diamond Walnut Growers, Inc. merged with and into Diamond Foods, Inc., converted from a

26  cooperative association to a Delaware corporation, and completed an initial public offering of

27  Diamond common stock. The Company specializes in processing, marketing and distributing snack

28

1 products and culinary, in-shell and ingredient nuts. The Company sells its products through the
2 following product categories:

3       (a)   Snack. The Company sells snack products under the Emerald®, Pop Secret®
4 and Kettle Brand® brands. Emerald products include roasted, glazed and flavored nuts, trail mixes,
5 seeds, dried fruit and similar offerings packaged in resealable containers. Pop Secret microwave
6 popcorn from General Mills is offered in a variety of traditional flavors, as well as a "better-for-you"
7 product offering featuring 100-calorie packs. Kettle Brand is a leading premium potato and tortilla
8 chip company.

9       (b)   Culinary and Retail In-shell. The Company sells culinary nuts under the
10 Diamond of California® brand in grocery store baking aisles and produce aisles and through mass
11 merchandisers and club stores. Culinary nuts are marketed to individuals who prepare meals or
12 baked goods at home and who value fresh, high-quality products. Diamond also sells in-shell nuts
13 under the Diamond of California® brand, primarily during the winter holiday season.

14       (c)   Non-Retail. The Company markets ingredient nuts internationally under the
15 Diamond of California® brand to food processors, restaurants, bakeries and food service companies
16 and their suppliers.

17 **SUBSTANTIVE ALLEGATIONS**

18     36.   During the Relevant Period, the Audit Committee of Diamond Foods, Inc. was
19 comprised of Defendants Blechschmidt, Zollars, Wolford, and, until on or about November 15,
20 2011, Defendant Silveira. The principal functions of Diamond's Audit Committee are to:

21
22     • oversee the integrity of accounting and financial reporting processes of the issuer
    and the audits of the financial statements of the issuer;

23
24     • monitor the periodic reviews of the adequacy of the accounting and financial
    reporting processes and systems of internal control that are conducted by the
    Company's independent auditors and the Company's financial and senior
25     management;

26     • review and evaluate the independence and performance of the Company's
    independent auditors; and
27

28     • facilitate communication among the Company's independent auditors, the

SHAREHOLDER DERIVATIVE COMPLAINT              - 8 -

1    Company's financial and senior management and the Board.

2    37.    In order to serve these functions, Defendants Blechschmidt, Zollars, Wolford and

3    Silveira had, according to the Audit Committee Charter, "unrestricted access to

4    Company personnel and documents, and will have authority to direct and supervise an

5    investigation into any matters within the scope of its duties."

6

7    38.    Although Audit Committee members are supposed to be independent and have

8    expertise in financial matters and accounting principles, Defendant Silveira was not independent

9    and had no educational background or practical experience in finance or accounting. The Audit

10   Committee Charter explicitly stated that "Each member of the Committee will meet the

11   independence, financial sophistication and experience requirements of the Securities Exchange

12   Act of 1934, the rules and regulations promulgated thereunder by the Securities and Exchange

13   Commission ("*Commission*") and The NASDAQ Stock Market, as they may be amended from

14   time to time ("*Rules*"), except as otherwise permitted by such Rules. Each member of the

15

16   Committee will have the ability to read and understand fundamental financial statements."

17   39.    Defendants Blechschmidt, Zollars, Wolford and Silveira also had a duty to

18   review, discuss, and approve the Company's annual and quarterly financial statements and to

19   review and approve information about Diamond's finances and operational results given to

20   analysts and rating agencies. The Audit Committee Charter notes the following specific duties

21   of Blechschmidt, Zollars, Wolford and Silveira:

22

23   **A. Financial Statements and Disclosures**
     The Committee will:

24

25   1. *Review and discuss with management quarterly and annual results and the
     type and presentation of information to be included in the Company's related
     earnings press release prior to distribution to the public.*

26

27   2. *Review the Company's quarterly and annual financial statements, including
     any report on the Company's internal control over financial reporting*, and any

28

report or opinion by the independent auditors prior to distribution to the public or filing with the Commission.

3. In connection with the Committee's review of the annual financial statements:

• Discuss with the independent auditors, any internal audit department and management the financial statements and the results of the independent auditors' audit of the financial statements.

• Discuss any items required to be communicated by the independent auditors in accordance with Statement on Auditing Standards ("SAS") No. 61, Communication With Audit Committees (Codification of Statements on Auditing Standards, AU § 380), as amended. These discussions should include the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements and any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information.

• Discuss with management and the independent auditors the Company's selection, application and disclosure of critical accounting policies and practices.

4. *Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.*

5. In connection with the Committee's review of the quarterly financial statements:

• *Discuss with the independent auditors and management the results of the independent auditors' SAS No. 100, Interim Financial Information* (Codification of Statements on Auditing Standards, AU § 722) or similar review of the quarterly financial statements.

• *Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with management and the independent auditors*, including resolution of any disagreements among management and the independent auditors regarding financial reporting.

6. *Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies.*

7. *Review any (i) significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting or (ii) fraud involving management or any employee of the Company with a significant role in the*

***Company's internal controls over financial reporting*** that are disclosed to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer in connection with such officers' periodic review of the Company's internal controls over financial reporting.

40.    On December 8, 2010, Individual Defendants Neil, Mendes, Blechschmidt, Zollars, Wolford and Silveira caused the Company to issue a press release announcing its first quarter fiscal 2011 financial results reporting a 40% increase in sales and increasing its revenue and earnings guidance for fiscal 2011. The press release stated as follows:

**Diamond Reports a 40% Increase in Sales and Raises Guidance**

- Retail net sales grew 58%, led by a 130% increase in snack sales;

- Raising full-year sales guidance to $920 million to $945 million;

- Raising full-year EPS guidance to $2.43 to $2.49.

. . . Diamond Foods, Inc. today reported strong financial performance for its first quarter of fiscal 2011 and increased guidance for the full-year.

For the three months ended October 31, 2010, net sales grew 40 percent, with retail sales growing 58 percent to $227.8 million and snack sales increasing 130 percent to $137.6 million. Non-retail sales declined 32 percent to $24.8 million due primarily to the later tree nut harvest. Operating income increased 7 percent to $27.5 million, which includes a 98 percent increase in advertising for the quarter compared to the prior year. Fully diluted earnings per share (EPS) was $0.64, and excluding integration costs related to the acquisition of Kettle Foods, non-GAAP EPS was $0.65.

"We are pleased with the organic growth in our base retail business, which has been augmented by the addition of Kettle," said Michael J. Mendes, Chairman, President and CEO. "Our strong performance gives us the confidence to further invest in our brands while increasing our sales and earnings guidance."

\*       \*       \*

**Financial Highlights**

For the quarter, gross profit as a percentage of net sales was 25.2 percent.

Selling, general and administrative expense (SG&A) was $23.1 million during the quarter, or 9.1 percent of net sales compared to 7.5 percent of net sales during the prior year's period.

\*       \*       \*

**Financial Outlook**

For the second quarter of fiscal 2011, we expect sales of between $255 million and $265 million and non-GAAP EPS of between $0.85 and $0.91, reflecting

SHAREHOLDER DERIVATIVE COMPLAINT                                          - 11 -

an increase in first half of fiscal year guidance from $1.45 to $1.55 per share to $1.50 to $1.56 per share compared to $1.35 per share last year.

For the full year of fiscal 2011, we now expect sales of between $920 million and $945 million compared to $910 million and $940 million previously, which implies growth of 35 percent to 39 percent above fiscal 2010. We expect non-GAAP EPS to range from $2.43 to $2.49 compared to $2.38 to $2.48 previously. This implies net income growth of between 48 percent and 51 percent over fiscal 2010 non-GAAP results.

41.     On December 8, 2010, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC. The Form 10-Q was signed by defendant Neil and repeated and expanded upon the financial results in the December 8, 2010 press release. The Form 10-Q also discussed the manner in which the Company received and paid for walnuts used in its consumer snack products, including but not limited to stating that the purchase price to be paid to walnut growers would be determined by Diamond in good faith.

42.     After the December 8, 2010 earnings release and Form 10-Q were issued, the Company's stock price increased from a close of $45.82 per share on December 8, 2010 to a close of $50.59 per share on December 9, 2010.

43.     On March 8, 2011, Individual Defendants Blechschmidt, Neil, Zollars, Silveira, Mendes and Woldford caused the Company to issue a press release announcing its financial results for its second quarter of fiscal 2011, reporting record results and again increasing the Company's financial guidance for fiscal year 2011:

**Diamond Reports Record Sales and Earnings and Increases Guidance**

- Retail net sales grew 63 percent, fueled by the addition of Kettle and double-digit organic snack sales growth;

- Earnings more than doubled leading to non-GAAP EPS growth of 90%;

- Raising full-year non-GAAP EPS guidance to $2.45 to $2.51.

. . . Diamond Foods, Inc today reported record sales growth and a more than doubling of earnings in its second quarter of fiscal 2011. The company is increasing full-year non-GAAP earnings per share (EPS) guidance by $0.02 to a range of $2.45 to $2.51 . . . .

SHAREHOLDER DERIVATIVE COMPLAINT                                                      - 12 -

1    For the three months ended January 31, 2011, diluted EPS grew 67 percent to
     $0.87 compared to $0.52 for the prior year's comparable period. Excluding $0.9
2    million in integration costs related to the Kettle acquisition last March, non-GAAP
     EPS was up 90 percent to $0.91 compared to $0.48 for the prior year's quarter.

3
                            *       *       *
4
                         **Financial Highlights**
5
             Net sales during the quarter were $257.6 million, 40 percent above the prior
6    year, and retail sales were $215.6 million, up 63 percent, driven by significant snack
     revenue growth due to the addition of Kettle and strong organic snack sales. In-shell
7    retail sales were up 15 percent driven by strong sell through during the holiday
     season.
8
                            *       *       *
9
             Selling, general and administrative expense (SG&A) was $24.0 million
10   during the quarter, or 9.3 percent of net sales. Advertising expense was on plan at
     $10.0 million for the quarter. A greater portion of consumer support will be spent in
11   the second half of the fiscal year.

12           The effective tax rate was 34.2 percent for the quarter.

13           EBITDA grew 81 percent to $83.4 million year to date.

14           As of January 31, 2011, net debt outstanding was $525.4 million, a reduction
     of $21.6 million from the first fiscal quarter.
15
                          **Financial Outlook**
16
             For the third quarter of fiscal 2011, we expect non-GAAP EPS of between
17   $0.45 and $0.50 and net sales of between $210 million to $220 million.

18           For the full year of fiscal 2011, we now expect net sales of between $925
     million and $950 million compared to $920 million and $945 million previously,
19   which implies growth of 36 percent to 40 percent above fiscal 2010. We are raising
     non-GAAP EPS guidance by $0.02 to a range of $2.45 to $2.51, which implies net
20   income results growth of between 53 percent and 57 percent over fiscal 2010 non-GAAP
     results.
21
             44.    On March 8, 2011, the Individual Defendants caused the Company to file its quarterly
22
report on Form 10-Q with the SEC. The Form 10-Q was signed by defendant Neil, and reviewed
23
and approved beforehand by Defendants Silveira, Blechschmidt, Wolford and Zollars, and repeated
24
and expanded upon the financial results in the March 8, 2011 press release. The Form 10-Q also
25
discussed the manner in which the Company received and paid for walnuts used in its consumer
26
snack products, including but not limited to, stating that the purchase price to be paid to walnut
27
growers would be determined by Diamond in good faith.
28

SHAREHOLDER DERIVATIVE COMPLAINT                                          - 13 -

45.     On April 5, 2011, the Company announced that it had entered into a definitive agreement with P&G to merge P&G's Pringles business into Diamond. The transaction was valued at $2.35 billion in cash and stock and would be accomplished through a "Reverse Morris Trust" transaction. The Agreement and Plan of Merger was approved by all the Individual Defendants. The press release discussed the Company's projected fiscal 2011 financial results had Pringles been owned by the Company for the entire fiscal year and estimated fiscal 2012 results for the combined Company.

**Diamond Foods to Merge P&G's Pringles Business into the Company**

*Accretive combination makes Diamond the number two global player in savory snack category*

. . . Diamond Foods, Inc. and The Procter & Gamble Company today announced the signing of a definitive agreement to merge the Pringles business ("Pringles") into Diamond Foods in a transaction valued at $2.35 billion.

"Pringles is an iconic, billion dollar snack brand with significant global manufacturing and supply chain infrastructure," said Michael J. Mendes, Chairman, President and CEO of Diamond Foods. "Our plan is to build upon the brand equity Pringles has established in over 140 countries. This strategic combination will create an independent, global leader in the snack industry with a focus on quality and innovative products. Not only is this combination immediately accretive, it also creates a platform that we believe will allow us to build shareholder value for years to come."

\*      \*      \*

The combination will more than triple the size of Diamond's snack business and:

- Increase scale in U.S. grocery, mass merchandise, drug and convenience channels to gain greater merchandising and distribution influence;

- Leverage Diamond's sales and distribution infrastructure through a more than doubling of snack sales in the U.S. and U.K., which are Pringles' two largest markets;

- Gain a broader global manufacturing and supply chain platform, with access into key growth markets around the world, including Asia, Latin America and Central Europe;

- Increase Diamond's geographic diversity, with international sales accounting for approximately 49 percent of total revenues on a pro forma basis.

Diamond Foods has a history of building, acquiring and energizing brands through product and package innovation, efficient distribution and brand investment. *The Company's total revenues have doubled and earnings per share (EPS) have grown more than four-fold in the past five years.*

SHAREHOLDER DERIVATIVE COMPLAINT                                          - 14 -

*   *   *

**Financial Benefit for Diamond Foods Shareholders**

Assuming Pringles had been owned for all of fiscal year 2011, the combined company would be expected to deliver the following estimated financial results on a pro forma basis for fiscal year 2011:

- Net sales of approximately $2.4 billion;

- Double-digit accretion to earnings per share (EPS), excluding merger and integration costs;

- Estimated earnings before interest, taxes, depreciation and amortization (EBITDA), including $25 million in synergies, of approximately $398 million to $410 million.

For fiscal year 2012, Diamond anticipates strong growth in its core business with EPS of $2.85 to $2.98 per share on a standalone basis, an increase of 15 percent to 20 percent from the midpoint of its fiscal 2011 guidance range, which represents a 30 percent increase over 2010 EPS.

Combined results for Diamond plus the Pringles business for fiscal year 2012 will depend on the actual closing date of the transaction. Assuming the transaction closes by the end of calendar 2011, seven months of Pringles performance would be included in the following expected results:

- Fiscal 2012 total net sales are estimated to be approximately $1.8 billion;

- Fiscal 2012 EPS, before costs associated with the transaction and integration, are estimated to range from $3.00 to $3.10 per share, which reflects EPS accretion of 12 to 15 cents per share

The transaction is expected to significantly increase cash flow and accelerate the de-levering of Diamond's balance sheet. Pro forma leverage at closing is projected to be below four times EBITDA, and projected to drop below three times at the end of fiscal 2013. Cash flow after brand investments and capital expenditures is expected to approach $200 million in the first full fiscal year after closing the merger.

*   *   *

**Transaction Details**

P&G expects the separation to occur through a "split-off" transaction in which P&G shareholders can elect to participate in an exchange offer to exchange P&G shares for shares of Diamond. Under the terms of a split-merge agreement, P&G will establish a separate entity to hold the Pringles business, which will be distributed to electing P&G shareholders in a tax-efficient transaction with a simultaneous merger with Diamond. This "Reverse Morris Trust" transaction has been approved by the boards of both companies. We expect to finalize the details of this transaction in the coming months.

The value of the transaction is $2.35 billion, comprising $1.5 billion in Diamond common stock, consisting of 29.1 million shares for approximately 57

1   percent of the outstanding shares of the combined company, and the assumption of
    $850 million of Pringles debt. Diamond's existing shareholders would continue to
2   own approximately 43 percent of the combined company.

3       The parties have also agreed to a collar mechanism that would adjust the
    amount of debt assumed by Diamond based upon Diamond's stock price during a
4   trading period prior to the commencement of the Exchange Offer. The amount of
    debt to be assumed by Diamond could increase by up to $200 million or decrease by
5   up to $150 million based on this adjustment mechanism.

6       Diamond expects to incur one-time costs of approximately $100 million
    related to the transaction over the next two years. P&G also will provide Diamond
7   transition services for up to 12 months after closing.

8   **Leadership, Approvals and Timing**

9       The combined business will be managed by Diamond's executive team and
    board of directors, led by Michael J. Mendes, Chairman, President and CEO. The
10  company's headquarters will remain in San Francisco, California.

11      The transaction is subject to approval by Diamond shareholders and the
    satisfaction of customary closing conditions and regulatory approvals. The
12  transaction is expected to be completed by the end of calendar 2011.

13  (Footnotes omitted.)

14      46.     After the April 5, 2011 announcement of the Company's agreement with P&G to

15  acquire the Pringles business, Diamond's stock price increased more than 8% from a close of $57.22

16  per share on April 4, 2011 to a close of $62.39 per share on April 6, 2011, on heavy trading volume.

17      47.     The following chart illustrates, in simplified form, the effect the merger will have on

18  Diamond's existing corporate structure if the merger is approved:

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT                                              - 16 -





48.     On June 2, 2011, the Individual Defendants caused Diamond to report its third quarter fiscal 2011 financial results. The financial results were reviewed and approved by Defendants Mendes, Neil, Silveira, Blechschmidt, Wolford and Zollars. The Company reported that sales and

1  earnings increased 61% and 91%, respectively, and raised its guidance for fiscal 2011 non-GAAP

2  EPS to $2.48-$2.52 per share from $2.45-2.51 per share.

3  **Diamond Foods Raises Guidance After Strong Third Quarter**

4  • Net sales increased 61%, non-GAAP earnings grew 91%;

5  • Snack sales up 72%, reflecting double-digit organic snack sales growth and the addition of Kettle;

6

7  • *Raising full-year fiscal 2011 non-GAAP EPS guidance.*

8  . . . Diamond Foods, Inc. today reported strong financial results for its third quarter of fiscal 2011 and raised guidance for fiscal year 2011.

9  For the three months ended April 30, 2011 non-GAAP diluted earnings per share (EPS) was $0.52 and non-GAAP net income was $11.8 million, 91 percent

10  above the prior year's comparable net income. On a GAAP basis, EPS was $0.34 compared to $(0.22) for the prior year's comparable period. This year's GAAP EPS

11  included costs associated with the announced merger with Pringles and integration costs associated with the Kettle acquisition, while last year's GAAP EPS included

12  costs associated with the Kettle acquisition.

13  "Our business performed well during the quarter, including double digit organic growth in our snack portfolio," said Michael J. Mendes, Chairman, President

14  and CEO. "Based on our strong overall performance and effective integration of Kettle, we have increased our financial guidance for the year. We're off to a strong

15  start in planning for the integration of Pringles, and are encouraged by the prospects for the new combined entity."

16

17  **Corporate Highlights**

18  *       *       *

19  • On April 5, 2011, Diamond announced the merger of P&G's Pringles business into Diamond in a Reverse Morris Trust transaction with an expected close

20  by the end this calendar year.

21  • Adjusted EBITDA grew 139 percent to $32.4 million.

22  • A quarterly dividend of $0.045 per share was paid on May 3, 2011 to shareholders of record as of April 22, 2011.

23  *       *       *

24  **Financial Results**

25  Net sales during the quarter grew 61 percent to $223 million, driven by significant growth in snack revenue and international non-retail sales. Snack revenue

26  growth of 72 percent is attributed to two additional months of Kettle in the results this year and double digit organic growth across the snack portfolio. Non-retail sales

27  for the quarter grew as a result of increased supply that was primarily shipped to international markets. Fiscal year-to-date net sales grew 46 percent to $733.1 million.

28

SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 18 -

For the quarter, gross profit as a percentage of net sales was 26.7 percent compared to the prior year quarter's 22.4 percent, primarily as a result of sales mix and productivity improvements. For the first nine months of the fiscal year, gross profit as a percentage of net sales was 26.5 percent, 320 basis points above the prior year comparable period's 23.3 percent. . . .

Selling, general and administrative expense (SG&A) was $24.2 million during the quarter, and SG&A as a percentage of net sales was 10.8 percent. Fiscal year-to-date SG&A was $71.3 million, or 9.7 percent of net sales.

Advertising expense was $11.9 million during the quarter, up 57% over the prior year comparable period, driven by multi-media support for the successful Breakfast on the go! launch in grocery retailers. Advertising expense for fiscal year-to-date was $34.4 million, 32 percent above the prior year's level of $26 million.

Adjusted EBITDA grew 94 percent to $115.8 million year to date.

As of April 30, 2011, net debt outstanding was $549.4 million and net leverage ratio was 3.9.

**Financial Outlook**

For the fourth quarter of fiscal 2011, we expect non-GAAP EPS of between $0.40 to $0.44 and net sales of between $210 million to $220 million.

This fourth quarter guidance implies that for the full fiscal year, we now expect net sales of between $943 million to $953 million compared to $925 million to $950 million previously and non-GAAP EPS of $2.48 to $2.52 compared to $2.45 to $2.51 previously. *This increased EPS guidance represents growth in net income of 52 percent to 55 percent over full fiscal 2010 results. This full year guidance reflects*:

• Snack sales of $545 million to $560 million;

• Gross margin growth of 200 to 300 basis points over 2010;

• Advertising investment of $43 million to $44 million;

• Operating income as a percent of net sales of 11 percent to 12 percent, excluding acquisition and integration costs;

• Adjusted EBITDA of $142 million to $145 million;

• An effective tax rate of 33 percent.

For fiscal 2012, guidance is unchanged since it was first provided on April 5, 2011. For Diamond on a standalone basis, we anticipate non-GAAP EPS of $2.85 to $2.98, an increase of 14 percent to 19 percent over the midpoint of the updated guidance range for 2011. Combined EPS results for Diamond plus Pringles, assuming the transaction closes by the end of this calendar year, are expected to be $3.00 to $3.10 per share, excluding costs associated with the transaction and integration.

(Footnotes omitted.)

1        49.    On June 21, 2011, the Company announced that the Hart-Scott Rodino Act waiting

2    period had expired, thus removing one hurdle to the execution of the Pringles acquisition:

3              **Diamond Foods Announces Expiration of Hart-Scott-Rodino Act Waiting Period for Acquisition of Pringles**

4

5             . . . Diamond Foods, Inc. today announced that the waiting period for U.S. antitrust review under the Hart-Scott Rodino Antitrust Improvements Act of 1976 for Diamond Foods' pending acquisition of the Pringles business from The Procter & Gamble Company expired on June 20, 2011. The pending acquisition remains subject to regulatory approval by competition authorities in various jurisdictions outside the United States.

6

7

8             On April 5, 2011, Diamond Foods announced the signing of a definitive agreement to acquire the Pringles business from The Procter & Gamble Company in a Reverse Morris Trust transaction valued at $2.35 billion. The transaction, expected to close by the end of this calendar year, is also subject to satisfaction of other conditions including approval by Diamond's stockholders.

9

10

11        50.    On September 15, 2011, Individual Defendants Mendes, Neil, Silveira, Blechschmidt,

12    Wolford and Zollars caused the Company to issue a press release announcing its fourth quarter 2011

13    and fiscal year 2011 financial results:

14        **Diamond Reports Record 2011 Results and Raises Guidance for Fiscal 2012**

15        •  Snack sales grew 16 percent in the fourth quarter and 72 percent for the fiscal year;

16

17        •  Non-GAAP Earnings Per Share (EPS) increased 37 percent for the fiscal year;

18        •  Raising sales and EPS guidance for fiscal 2012.

19            . . . Diamond Foods, Inc. today reported record financial results for its fiscal 2011 fourth quarter and full year.

20            For the three months ended July 31, 2011, the first full comparable quarter since the acquisition of Kettle Foods, non-GAAP net income grew 58 percent to $11.9 million and non-GAAP fully diluted earnings per share (EPS) grew 53 percent over the prior year's quarter to $0.52. During the quarter, the Company incurred $9.4 million in acquisition and integration costs related to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles. Including these charges, *GAAP net income grew 27 percent to $8.5 million and GAAP fully diluted EPS was $0.37, up 23 percent.*

21

22

23

24

25            For the twelve months ended July 31, 2011, non-GAAP net income grew 61 percent over the prior year period to $59.0 million and non-GAAP EPS grew 37 percent to $2.61. Including $16.8 million in acquisition and integration costs related to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles, *GAAP earnings grew 92 percent to $50.2 million, and GAAP EPS grew 63 percent to $2.22.*

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT                               - 20 -

1

2

3

"*Our base Diamond business delivered record financial results this quarter, with our snack portfolio up a solid 16 percent on an organic basis,*" said Michael J. Mendes, Chairman, President and CEO. "We're particularly pleased that we could achieve such strong performance while effectively managing the Pringles integration."

4

### Corporate Highlights

5

\*       \*       \*

6

- Full year adjusted EBITDA grew 72 percent to $146 million.

7

8

9

- . On August 3, 2011, the Company received the last of its antitrust clearances required for its pending merger of the Pringles business into Diamond in a Reverse Morris Trust transaction. The transaction is expected to close in December of this year.

10

- . Significant progress on Pringles integration activities including go-to-market planning, preparing to onboard employees at close, day one readiness and transition services planning.

11

12

- A quarterly dividend of $0.045 per share was paid on August 8, 2011 to shareholders of record as of August 1, 2011.

13

### Financial Results

14

15

16

17

Net sales during the quarter grew 32 percent to $232.8 million as a result of the strong performance of the snack portfolio and an increase in non-retail sales. Total retail net sales grew 14 percent to $191.0 million, and snack sales grew 16 percent to $145.7 million in the quarter. Non-retail sales totaled $41.8 million for the quarter compared to $41.3 million in the third quarter and $8.7 million in the fourth quarter a year ago. Full fiscal year net sales grew 42 percent to $965.9 million, with retail net sales up 43 percent to $816.1 million. Snack sales grew 72 percent for the full year and reached $553.2 million.

18

19

Gross profit as a percentage of net sales was 24.5 percent for the quarter and 26 percent for the year. The lower gross margin in the quarter reflects the relatively large percentage of non-retail sales in the quarter.

20

21

Selling, general and administrative expense (SG&A) was $25.7 million during the quarter. For the full fiscal year SG&A was $97.0 million, or 10 percent of net sales.

22

23

24

Advertising expense was $10.1 million during the fourth quarter, up 45 percent over last year's comparable period. For the full fiscal year, advertising expense was $44.4 million or 5.4 percent of retail net sales, an increase of $11.5 million over last year.

25

26

27

The effective tax rate on a non-GAAP basis was 23.6 percent for the quarter and 31.3 percent for the year, reflecting favorable income mix within our tax jurisdictions. On a GAAP basis, the effective tax rate was (38.4) percent for the quarter and 27.4 percent for the year. The tax benefit in the quarter reflects a discrete benefit associated with the 2 percent U.K. rate reduction announced in July.

28

SHAREHOLDER DERIVATIVE COMPLAINT

Capital expenditures for the year were $28 million. The Kettle capacity expansion in Salem was completed in April and the U.K. and Beloit, Wisconsin Kettle expansions are on schedule for completion in the fall of 2011 and spring of 2012, respectively.

As of July 31, 2011, net debt was $512.8 million, a decrease of $37 million from the prior quarter.

### Financial Outlook

\*     \*     \*

For the full year of fiscal 2012, we expect non-GAAP EPS to range from $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December. This EPS guidance is increased from $3.00 to $3.10 previously and reflects:

- Net sales of between $1.85 billion and $1.95 billion;

- An estimated operating margin of between 11.5 percent and 12.0 percent;

- . Interest expense of between $40 million to $45 million;

- An effective tax rate of 27 percent to 30 percent;

- Outstanding share count of 42 million to 43 million;

- Capital expenditures of $75 million to $85 million;

- EBITDA of $300 million to $310 million;

- Transaction and integration costs of $150 million associated with the Pringles transaction over the next two years.

(Footnotes omitted.)

51.    On September 15, 2011, the Individual Defendants caused the Company to file its Form 10-K for the period ending July 31, 2011 with the SEC. The Form 10-K substantially repeated the Company's financial results for fiscal year 2011 as reported in the September 15, 2011 press release, and stated that the Company's financial statements were purportedly in compliance with GAAP. The Form 10-K was signed by Individual Defendants Mendes, Neil, Silveira, Blechschmidt, Zollars, Wolford, Lea, Warren and Baer.

52.    On September 27, 2011, *The Wall Street Journal* published an article entitled "Hidden Flaw in P&G's Diamond Deal," which discussed a $50 million payment the Company made in September 2011 to walnut growers, purportedly to "'optimize cash flow for growers . . . in light of the delayed harvest.'" The article suggested that the payment, had it been made during the

1 fiscal year which ended July 31, 2011, would have reduced the Company's fiscal 2011 operating

2 income by $50 million, devouring a substantial portion of the Company's reported fiscal 2011

3 earnings.

4   **THE MATERIALLY FALSE AND MISLEADING PROXY STATEMENT**

5   53.    On September 26, 2011, the Individual Defendants caused Diamond to issue a

6 definitive Proxy Statement which solicited Diamond shareholders to vote in favor of the merger with

7 P&G's Pringles division.   The Form 14(a) Proxy Statement was prepared and approved by

8 Individual Defendants Mendes, Neil, Silveira, Blechschmidt, Zollars, Wolford, Lea, Warren and

9 Baer.

10   54.    The Proxy Statement represented the following to be true and correct information

11 about Diamond's financial results:

12   **Summary Historical Consolidate Financial Data of Diamond:**

| | Fiscal Year Ended July 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars in millions, except per share data) | | |
| **Consolidated Statement of Income Data:** | | | |
| Net sales | $ 965.9 | $ 680.2 | $ 570.9 |
| Cost of sales | 714.8 | 519.2 | 435.3 |
| Gross profit | 251.1 | 161.0 | 135.6 |
| Operating expenses: | | | |
| Selling, general and administrative | 97.0 | 64.3 | 61.0 |
| Advertising | 44.4 | 33.0 | 28.8 |
| Acquisition and integration related expenses | 16.8 | 11.5 | — |

| | | | |
|---|---|---|---|
| Total operating expenses | 158.2 | 108.8 | 89.8 |
| Income from operations | 92.9 | 52.2 | 45.8 |
| Interest expense, net | 23.8 | 10.2 | 6.3 |
| Other expenses, net | — | 1.8 | 0.9 |
| Income before income taxes | 69.1 | 40.2 | 38.6 |
| Income taxes | 18.9 | 14.0 | 14.9 |
| Net income | $ 50.2 | $ 26.2 | $ 23.7 |
| Earnings per share: | | | |
| Basic | $ 2.28 | $ 1.40 | $ 1.45 |
| Diluted | $ 2.22 | $ 1.36 | $ 1.42 |

The summary historical consolidated financial data presented below have been derived from, and should be read together with,

| | As of July 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Consolidated Balance Sheet Data: | | |
| Total assets | $ 1,288.4 | $ 1,225.9 |
| Long-term debt, including current portion | 531.7 | 556.1 |
| Total stockholders' equity | $ 454.8 | $ 379.9 |

Diamond's consolidated financial statements and the accompanying notes and the related "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections included in Diamond's Annual Report on Form 10-K for the fiscal year ended July 31, 2011, which is incorporated by reference into this proxy statement. The summary historical consolidated financial data as of July 31, 2011 and 2010 and for the fiscal years ended July 31, 2011, 2010 and 2009 have been derived from audited financial statements incorporated by reference in this prospectus. The data shown below is not necessarily indicative of results to be expected for any future period. To find out where you can obtain copies of Diamond's documents that have been incorporated by reference, see "Where You Can Find More Information; Incorporation by Reference."

Summary Unaudited Condensed Combined Pro Forma Financial Data

This summary unaudited condensed combined pro forma financial data presented below have been prepared by Diamond and are being provided for illustrative purposes only and are not necessarily indicative of what the operating results or financial position of Diamond or Pringles would have been had the Transactions been completed at the beginning of the periods or on the dates indicated, nor are they necessarily indicative of any future operating results or financial position. Diamond and Pringles may have performed differently had they actually been combined during the periods presented.

| | For the Fiscal Year Ended July 31, 2011 for |
|---|---|
| | Pro Forma Combined |
| | Diamond and Pringles |
| | (Dollars in millions, except per share data) |
| **Statement of Income Data:** | |
| Net sales | $ 2,421.6 |
| Gross profit | 782.8 |
| Net income | 147.5 |
| **Other Data:** | |
| Net income per share of common stock, basic | $ 2.89 |
| Net income per share of common stock, diluted | $ 2.85 |
| Weighted-average shares of common stock outstanding, basic | 50.7 |
| Weighted-average shares of common stock outstanding, diluted | 51.3 |
| **Financial Position (at period end):** | |
| Cash and cash equivalents | $ 6.8 |
| Total assets | 4,913.7 |
| Long-term debt | 1,194.7 |
| Other noncurrent liabilities | 679.4 |
| Total stockholders' equity | 2,512.0 |

Comparative Historical and Pro Forma Per Share Data

The following tables set forth historical and pro forma per share data for Diamond. The Diamond historical data have been derived from, and should be read together with, the audited consolidated financial statements of Diamond and the related notes thereto contained in Diamond's Annual Report on Form 10-K for the fiscal year ended July 31, 2011 and incorporated by reference into this proxy statement. The Diamond pro forma data have been derived from the unaudited condensed combined pro forma financial data of Diamond included elsewhere in this proxy statement. See "Where You Can Find More Information; Incorporation by Reference."

This summary of comparative historical and pro forma per share data is being provided for illustrative purposes only and is not necessarily indicative of the results that would have been achieved had the Transactions been completed during the period presented, nor are they necessarily indicative of any future results. Diamond and Pringles may have performed differently had the Transactions occurred prior to the period presented. You should not rely on the pro forma per share data presented as being indicative of the results that would have been achieved had Diamond and Pringles been combined during the period presented or of the future results of Diamond following the Transactions.

///

SHAREHOLDER DERIVATIVE COMPLAINT

The following table presents certain historical and pro forma per share data for Diamond:

| | As of and for the Fiscal Year Ended July 31, 2011 | | | |
| | | Historical | | Pro Forma |
| Diamond: | | | | |
| Earnings Per Share Data: | | | | |
| Basic | $ | 2.28 | $ | 2.89 |
| Diluted | $ | 2.22 | $ | 2.85 |
| Shares of common stock used to compute earnings per share (in millions): | | | | |
| Basic | | 21.6 | | 50.7 |
| Diluted | | 22.2 | | 51.3 |
| Book value per share of common stock | $ | 21.08 | $ | 49.57 |
| Cash dividends declared per share of common stock | $ | 0.18 | $ | 0.18 |

55.     These statements in the Proxy concerning Diamond's revenues, expenses, and profits in fiscal year 2011 were false and misleading because they omitted approximately $50 million in payments that Diamond should have made to its walnut suppliers in fiscal 2011. Diamond later made the payments in September 2011 (its Q1 2012 fiscal quarter) and attempted to justify the deferment by falsely claiming that the payments were "momentum" payments for 2012. This deferment of $50 million in payments was highly material since Diamond only reported $50.2 million in net income for its 2011 fiscal year. Thus, had the Individual Defendants properly accounted for such payments, Diamond would have realized almost no net income for 2011.

56.     The Proxy further disclosed the following:

*Raw Materials and Supplies*

Diamond obtains its raw materials from domestic and international sources. Diamond currently purchases a majority of its walnuts from growers located in California who have entered into long-term supply contracts with Diamond. Additional walnuts may be purchased from time to time from other California walnut processors. Diamond purchases its other nut requirements from domestic and international processors on the open market. For example, during fiscal 2011, all of the walnuts, peanuts and almonds Diamond obtained were grown in the United States, most of Diamond's supply of hazelnuts came from the United States and Diamond's supply of pecans were sourced from the United States and northern Mexico.

**Seasonality**

Diamond experiences seasonality in its business. Demand for Diamond's in-shell and culinary products is highest during the months of October, November and December.

Diamond purchases walnuts and pecans between August and February, and processes them throughout the year until the following harvest. Diamond purchases potatoes throughout the year, and demand for potato chips is highest in the months of June, July and August in the United States and November and December in the United Kingdom. As a result of this seasonality, Diamond's personnel, working capital requirements and inventories peak during the last four months of the calendar year. Diamond experiences seasonality in capacity utilization at its Stockton, California and Fishers, Indiana facilities associated with the annual walnut harvest.

57.    On September 27, 2011, Jefferies published a report entitled "Much Ado about Nothing," which discussed the September *Wall Street Journal* article, stating that the stock price decline in response to the article was an overreaction:

**The Diamond Foods (DMND)**

Much Ado About Nothing

**Yesterday DMND declined 5.7% on reports that profits in 1Q are in jeopardy due to unusual one-time payments to walnut growers the company made in September. We believe that the stock overreacted. It is our understanding that DMND usually makes payments to growers in late August/early September, and even though the size of the payment might have been bigger this year we do not believe that it jeopardizes quarterly results. Regular payments to growers are a result of the walnut purchase agreement.**

\*    \*    \*

DMND's contract with growers basically guarantees the purchase of the entire walnut crop of a contracted grower with the price being determined only after DMND has sold the walnuts. As a result, DMND estimates the approx. liability to growers and makes periodic payments towards this estimate. The liability to growers peaks in the first half of the fiscal year . . . as the harvest is delivered, and then declines as the walnuts are sold and growers are paid. It is our understanding that the September payment of estimated $50 million (source: Wall Street Journal) was such a periodic disbursement to growers – even though the reported amount is not anywhere near the actual payment according to mgmt.

**As the September payment was not unusual, we believe the stock overreacted**.

Instead of potentially wiping out more than half of the reported FY11 EBIT the payment appears to be the regular cost of doing business and is part of the expected 1Q12 COGS for DMND.

58.    On October 3, 2011, Individual Defendants Mendes, Neil, Blechschmidt, Silveira, Wolford and Zollars caused the Company to issue a press release entitled "Media Statement – Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance." The press release stated as follows:

SHAREHOLDER DERIVATIVE COMPLAINT                                                   - 27 -

1    **Media Statement – Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance**

2    . . . Diamond Foods, Inc. made a pre-harvest momentum payment to walnut
     growers in early September, prior to the delivery of the fall walnut crop to reflect the
3    fiscal 2012 projected market environment. The payment is accounted for in fiscal
     2012 cost of goods sold and is reflected in the guidance provided by the company on
4    September 15, 2011.

5    Diamond reaffirms the guidance provided in its press release dated September
     15, 2011, which reflects not only higher commodity costs expected in fiscal 2012,
6    but also recent retail price increases taken for its products. Diamond believes it has
     an ample walnut supply for both the retail and value-added, non-retail business.

7
                                   **Financial Outlook**
8
     For the first half of fiscal 2012, for Diamond on a standalone basis, we expect
9    total net sales of between $540 million to $560 million, an increase in advertising
     investment of 20-25% over the first half of 2011 and non-GAAP EPS ranging from
10   $1.65 to $1.75. We expect the distribution of earnings between Q1 and Q2 to be
     similar to last year's first half.

11
     For the full year of fiscal 2012, we expect non-GAAP EPS to range from
12   $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December
     and reflects:

13
     • Net sales of between $1.85 billion and $1.95 billion;
14
     • An estimated operating margin of between 11.5 percent and 12.0 percent;
15
     • Interest expense of between $40 million to $45 million;
16
     • An effective tax rate of 27 percent to 30 percent;
17
     • Outstanding share count of 42 million to 43 million;
18
     • Capital expenditures of $75 million to $85 million;
19
     • EBITDA of $300 million to $310 million;
20
     • Transaction and integration costs of $150 million associated with the Pringles
21   transaction over the next two years.

22        59.    On October 4, 2011, after meeting with Company management, RBC Capital Markets

23   published a report entitled "'He Said, She Said' –Highlights of Marketing with Management,"

24   discussing disclosures concerning "'momentum payments'" to walnut growers and conveying

25   management's "adamant" claim that the momentum payments were not designed to pay the walnut

26   growers for the prior year's crop and that investor concerns were indeed unfounded:

27   **Diamond Foods, Inc. (NASDAQ: DMND)**

28   "He Said, She Said"

1                                          *     *     *

2       Highlights From Marketing With Management

3                                          *     *     *

4              **We marketed with Diamond management yesterday and came away
        comfortable that the walnut controversy should subside in due course.**
5       Unfortunately, this is largely a "he said, she said" debate since management does not
        provide clear disclosure of its walnut profitability or grower payments. However,
6       unless management is not being truthful, which we don't think is the case, the bear
        case should not prevail.
7
               **Management gave clear answers to the two most important questions
8       related to the walnut issue.** First, management is adamant that the company did not
        structure or communicate the "momentum payment" made last month as a form of
9       compensation for last year's crop. Second, management commented that
        substantially all of the gross margin expansion in FY-11 was driven by Kettle and
10      Emerald, and that margins for the other businesses – walnuts included – were similar
        to the prior year. If true, this means that walnuts did not massively over-earn in FY-
11      11.

12      60.     On October 27, 2011, the Company announced that Diamond shareholders had

13      approved a proposal to issue new Diamond shares in connection with the Company's acquisition of

14      P&G's Pringles business:

15             **Diamond Foods Shareholders Approve Issuance of Shares in Connection
        With Pringles Transaction**
16
               . . . Diamond Foods, Inc. today announced that its shareholders approved a
17      proposal to issue Diamond Foods common shares in connection with the merger of
        the Pringles business into Diamond. At the special meeting of shareholders held
18      today, Diamond shareholders also approved all other proposals recommended by the
        Board of Directors.
19
               Closing of the transaction remains subject to customary closing conditions
20      and completion of the exchange offer by The Procter & Gamble Company ("P&G").
        Antitrust approvals required for the transaction have already been obtained.
21
        61.     On November 1, 2011, the Company issued a press release stating that the Audit
22
        Committee of the Board of Directors would perform an internal investigation into the accounting for
23
        the payments to walnut growers and that the highly anticipated merger transaction with Pringles,
24
        which had been scheduled to close before the end of the year, would be delayed until mid-2012:
25
               **Diamond Foods Provides Update on Pringles Transaction**
26
               . . . Diamond Foods, Inc. today announced that its previously announced
27      acquisition of the Pringles snack business from The Procter & Gamble Company
        ("P&G") is now expected to close in the first half of calendar 2012. Diamond and
28      P&G had previously expected the closing to occur in December of 2011.

SHAREHOLDER DERIVATIVE COMPLAINT                                                        - 29 -

1    Diamond and P&G have revised the expected closing date of the acquisition
     following the receipt by the Chairman of the Audit Committee of Diamond's Board
2    of Directors of an external communication regarding Diamond's accounting for
     certain crop payments to walnut growers. In response to the communication,
3    Diamond's Audit Committee decided to perform an investigation of this matter.
     Management is fully committed to supporting the Audit Committee in this process.
4
          Closing of the Pringles transaction remains subject to customary closing
5    conditions and completion of an exchange offer by P&G. Antitrust approvals
     required for the transaction have already been obtained.
6
     62.    On the November 1, 2011 disclosures, the Company's stock price plummeted 17% to
7
   close at $52.79 per share on November 2, 2011, down from $64.12 per share on November 1, 2011,
8
   on massive trading volume.
9
     63.    Then, on November 5, 2011, *Barron's Online* published an article entitled "Getting to
10
   the Nut of the Problem."   The article discussed in detail the Company's September 2011
11
12  "momentum payment" to walnut growers and suggested that the Company may have overstated its

13  fiscal 2011 financial results. In addition, the article stated that Diamond's Head of Field Operations

14  recently admitted that the "momentum payment" was indeed payment for the fiscal 2010 walnut

15  crop as opposed to the fiscal 2011 walnut crop:

16    Getting to the Nut of the Problem

17
          After nearly a century as a walnut growers' cooperative, Diamond Foods
18   broke out of its shell with a 2005 initial public offering. The San Francisco company,
     which also sells pine nuts, almonds and pecans, proceeded to gobble up snack brands
19   that included Pop Secret popcorn and Kettle chips – and promoting them with cheeky
     television ads, among them, an annual 30-second spot on the Super Bowl.
20
          In April, Diamond took an even bigger bite, announcing plans to acquire the
21   Pringles chips business from [Procter & Gamble] (PG) in exchange for Diamond
     stock. Those shares had themselves become a premium brand. . . .
22
          Then, The Wall Street Journal talked to some walnut growers and found
23   serious issues with Diamond's accounting issues that had escaped the eagle-eyed
     advisors on the Pringles deal: Bank of America Merrill Lynch, Morgan Stanley and
24   the Blackstone Group. On Tuesday, Diamond delayed the Pringles closing while the
     audit committee of its board of directors investigates how Diamond accounted for its
25   walnut-crop payments. Diamond's shares closed late Friday at $46.40, below their
     level when the Pringles plan was announced.
26
          After Diamond's walnut accounting gets scrutiny, the stock could get crushed
27   again.

28

SHAREHOLDER DERIVATIVE COMPLAINT                                              - 30 -

*Suspect accounting for walnut purchases could crack snack-food producer Diamond Foods' deal to buy Pringles from Procter & Gamble.*

\*       \*       \*

Even after the selloff, Diamond shares look pricey. The acquisitive outfit has no tangible book value. It reported earnings for the fiscal year ended July 2011 of $2.61 a share (ignoring pesky noncash charges, like option expenses), so Diamond's multiple on those trailing earnings is a generous 18 times. And 2011 earnings were likely overstated, says Mark Roberts, whose Off Wall Street Consulting Group rang the first alarm about Diamond's nutty accounting on Sept. 25, when most of Wall Street was still cheering the company on. Had Diamond properly booked costs for fiscal 2011, Roberts estimates, it would've earned as little as $1.14 a share.

Diamond declined to talk about the walnut investigation, but a spokesman said that both Diamond and P&G remain committed to completing a Pringles deal next year, which would double the company's sales. Yet if questions arise about Diamond's "representations and warranties" as it offered its shares to P&G shareholders in exchange for the Pringles business, the deal could fall apart or at least become much more expensive for Diamond.

Diamond's co-op members got more than half the company's stock in the IPO and signed contracts to sell their entire crop to Diamond for a term of three, five or 10 years. Happily for the farmer shareholders and all others, the stock rose steadily from its IPO price of 17. At the same time, however, many growers became unhappy with their multiyear contracts with Diamond.

\*       \*       \*

Then, in early September, Diamond sent growers something it called "a momentum payment" of 30 to 40 cents a pound. The company said the payment was for the coming 2011 crop, but farmers believe it was really a way to bring Diamond's price for their 2010 crop closer to market rates. Transaction records examined by Off Wall Street's Roberts showed that, until 2009, Diamond had called its August check the "final payment" for the prior year's crop.

\*       \*       \*

This year, Diamond didn't use the word "final" on its August payment to a grower Roberts spoke with, telling the grower to expect a September "momentum payment." Believing himself underpaid, the farmer asked Diamond's head of field operations if the September payment was for the 2010 crop. According to Roberts, the Diamond executive said yes. Most puzzling, the September payments went to farmers who've ended their sales contracts with Diamond and won't be supplying it with their 2011 year crop. *Barron's* spoke with one of those growers.

Had the September payments been counted as part of Diamond's July 2011 fiscal year, Roberts thinks that the gross margin reported by the company would have shrunk to less than 20%, from about 25%"making the exchange of its shares for Pringles less appetizing for P&G shareholders.

1    64.    On November 7, 2011, following these detailed disclosures, Diamond's stock price
2  continued to decline on substantial trading volume, falling to a close of $39.09 per share, a 15%
3  decline from its Friday, November 4, 2011, close of $46.40 per share.

4    65.    On November 22, 2011, the Company disclosed that Defendant Silveira had died.
5  However, the Company did not disclose the fact that Silveira had committed suicide. A MSNBC
6  reporter subsequently investigated the situation and spoke with the local coroner in Stanislaus
7  County, California, who indicated that Silveira had died of a self-inflicted gunshot wound.

8    66.    News articles published after Silveira's death questioned whether Silveira's suicide
9  represented guilt for his involvement in publication of Diamond's false financial statements.
10  Questions were raised as to why Silveira had been on Diamond's Audit Committee in the first place,
11  given his lack of a background in finance and potential conflicts of interest he faced due to his
12  involvement with walnut growers and cooperatives. For example, a November 28, 2011 Seeking
13  Alpha article stated: "Nothing on his resume suggests he had any accounting experience or
14  education. His career skills look like he was a farm manager and deal maker." The article also
15  stated: "Aside from not having the education and accounting experience to be on the audit
16  committee, perhaps even more troubling is the conflict of interest. As shown here, which was
17  updated on 11/15/11, Joseph P. Silveira was the President, Chairman, and Director of Farmland
18  Management Services, Inc. This is an agricultural services company that I assume mostly serviced
19  nut growers. Silveira was a part of the walnut grower's group in California and managed walnut
20  orchards."

21    67.    A November 23, 2011 article in *Bloomberg* entitled "Diamond Pringles deal May Be
22  Hurt By Drop on Director's Death," stated:

23         "Diamond Foods Inc. (DMND)'s decline after a report that director Joseph Silveira
           committed suicide may further complicate its proposed deal to buy the Pringles snack brand
24         from Procter & Gamble Co. (PG) Silveira, who died Nov. 15, had served on the audit
           committee and recused himself from its investigation of payments to walnut growers.
25         Diamond said on Nov. 1 that the probe would delay the acquisition of Pringles in a deal
           valued at $2.35 billion. P&G shareholders have to exchange some shares for Diamond stock
26         as part of the agreement, and that may now be a harder sell, said Louis Meyer, a special-
           situations analyst for Oscar Gruss & Son Inc. in New York. Diamond's decline also may
27         force it to assume more debt to complete the takeover, Meyer said."
28

68.     On November 29, 2011, the New York Times published an article entitled "Diamond Foods Makes Odd Moves." The article stated:

"Things aren't getting any better for the snack food maker Diamond Foods. A month ago, it delayed its $2.4 billion plan to buy Pringles from Procter & Gamble in order to look into accounting concerns. Now, the company is burying news about the inquiry and increasing payments to a couple of directors who are walnut growers. These and other inconsistencies don't seem to augur well for the investigation, or its deal with Procter & Gamble.

When the Pringles acquisition was hot, Diamond shares soared to over $90. They now trade at less than a third of that. Bringing in extra auditing and legal help, as Diamond has done, should help its internal committee expedite matters. But rather than disclose the hires it made earlier this month, Diamond waited until Monday and shoehorned them into a release underneath news about market share gains.

Diamond hasn't exactly been a model of clarity. On Nov. 17, it publicly released a condolence note it wrote for Joseph P. Silveira, a board and audit committee member who had died. Only after news reports said that Mr. Silveira had committed suicide did the company say he had previously been excluded from the investigation because of a conflict of interest.

Then there are Diamond's purchases of its staple goods: walnuts. Some growers complained the company was severely undercutting rivals on price. That led to questions about the timing and accounting treatment of payments.

On another note, one Diamond director who is also a grower made more in just a few months of this fiscal year than he did in all of last, and another is already 80 percent of the way there. Each also earned over 40 percent more last year than the year before. Diamond says the growers were delivering more and were paid commensurately for their crops, but superficially the numbers don't seem consistent with what other growers say."

69.     On December 12, 2011, Individual Defendants Mendes and Neil caused Diamond to file a press release and Form 8-K stating that the Company would be unable to timely file its quarterly financial statements. In the press release, the Company stated that: "Diamond expects to receive a notice of deficiency from the Nasdaq Listing Qualifications Department, indicating that Diamond is not in compliance with Nasdaq Listing Rule 5250(c)(1)."

SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 33 -

70. Diamond has stated that it will be unable to file its Q1 2012 financial results until after completion of its internal investigation.

71. On December 15, 2011, Diamond Foods announced that it had been notified the preceding day that it had received a formal order of investigation from the United States Securities and Exchange Commission ("SEC") relating to whether the Company violated accounting rules in connection with payments made to walnut growers. Most SEC investigations are "informal." Formal investigations are more serious and more rare.

72. In response to the revelation of the formal SEC investigation, the Company's stock declined and Jefferies, which had previously called the situation "much ado about nothing," changed its mind and downgraded its rating on the stock to hold from buy and cut its price target to $27 from $46.

73. Forbes also published an article on December 15, 2011 noting that "The stock has been hit with staggering losses in recent months, as investigations into 'momentum payments' made to some of the company's vendors has postponed an important acquisition of Pringles from Procter & Gamble." The Forbes article quoted Jeffries as stating: "In our view, the announced SEC investigation creates too much of an overhang with uncertain timing and increases the risk that the Pringles deal will be terminated," and that Jefferies was taking a neutral stance until there is more clarity on the matter.

74. Meanwhile, Procter & Gamble spokesperson Jennifer Chelune stated on December 15, 2011 that "P&G's commitment to the transaction is predicated on the favorable resolution of all current investigations."

75. Thus, Defendants' wrongdoing and breaches of fiduciary duty have imperiled the $2.4 billion acquisition of Pringles, forced the Company to launch an internal investigation, subjected the Company to multiple securities class action lawsuits alleging fraud, caused stock analysts who follow the company to drastically reduce their target prices for the Company's stock, caused the loss of millions of dollars of market capitalization, and tarnished the Company's reputation among investors.

1                             **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

2       76.     Plaintiff brings this action derivatively in the right and for the benefit of The

3 Company to redress injuries suffered, and to be suffered, by The Company as a direct result of the

4 breaches of fiduciary duty, as well as the aiding and abetting thereof, and unjust enrichment by the

5 Individual Defendants. The Company is named as a nominal defendant solely in a derivative

6 capacity. This is not a collusive action to confer jurisdiction on this Court that it would not

7 otherwise have.

8       77.     Plaintiff will adequately and fairly represent the interests of The Company in

9 enforcing and prosecuting its rights.

10       78.     Plaintiff has continuously held stock in The Company during all times relevant to the

11 Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the

12 Company.

13       79.     The current Board of The Company consists of the following nine individuals:

14 defendants Baer, Blechschmidt, Gilbert, Lea, Wolford, Zollars, Neil, Mendes and Warren. Plaintiff

15 has not made any demand on the present Board of The Company to institute this action because such

16 a demand would be a futile, wasteful and useless act. Demand is futile for a combination of the

17 following reasons:

18       **Defendants Gilbert and Lea Are Interested Because They Received Some of the Walnut**

19 **Momentum Payments At Issue In This Litigation**

20       80.     Defendants Gilbert and Lea are interested, and not capable of exercising independent

21 judgment, because they are among the very walnut growers who received momentum payments in

22 September 2011. Diamond disclosed the following in its September 26, 2011 Proxy Statement:

23

      *Grower Payments*

24       Diamond has paid members of the Diamond Board who are currently growers from whom Diamond
purchases walnuts, or an affiliate of such growers, for walnut products Diamond received from them in the ordinary
25       course of business.

26       The following table shows the payments received by the directors who sold walnuts to Diamond in fiscal
2010 and fiscal 2011:

27

28

SHAREHOLDER DERIVATIVE COMPLAINT                                   - 35 -

| Name | Fiscal Year | Grower Payments |
|------|-------------|-----------------|
| John J. Gilbert(1) | 2011 | $ 2,744,476 |
| | 2010 | $ 1,916,048 |
| Robert M. Lea | 2011 | $ 844,487 |
| | 2010 | $ 557,853 |

(1)   Represents amounts paid to Rio Oso Groves, Inc., of which Mr. Gilbert is an owner and executive officer, and to Gilbert Orchards, a corporation of which Mr. Gilbert is an owner and executive officer.

Given the magnitude of the payments Gilbert and Lea received from Diamond for their walnut crop, and the fact that the momentum payments and the characterization of the payments are key issues in this litigation, Gilbert and Lea are directly interested. Also, they could be key witnesses in the litigation. Since they had and continue to have contracts with Diamond to grow walnuts and deliver them to Diamond, Gilbert and Lea have direct knowledge as to whether the payments Diamond made in September 2011 were "momentum" payments for fiscal year 2012, as Diamond claims, or payments that should have been made in fiscal year 2011. Since their testimony could directly undercut Diamond's contention that the payments did not have to be made in fiscal year 2011, and indeed give rise to their own liability as directors for signing Diamond's 2011 Form 10-K that was false and misleading, Gilbert and Lea stand on both sides of the issue and are hopelessly conflicted. Thus, any demand as to them is futile and not required.

**Defendant Mendes**

81.   Mendes is the Chairman and CEO of the Company. The principal professional occupation of Mendes is his employment with The Company, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. In fact, the Company paid Mendes more than $4.3 million in compensation in 2010 alone. Given his personal ties to the Company, as well as his significant compensation, Mendes is not capable of fairly considering a demand that he initiate this lawsuit against himself or his fellow directors.

82.   Further, as Chairman and CEO, Mendes is ultimately responsible for ensuring that The Company maintains effective accounting controls and complies with state and federal laws and regulations concerning the Company's financial results. As discussed above, Mendes breached these

1  duties and, thus, is not capable of fairly considering a litigation demand. Mendes is currently named
2  as a defendant in the class action alleging violation of the federal securities laws. He caused the
3  Company to issue financial statements that he certified, under the Sarbanes Oxley Act, to be true and
4  accurate, but which now will have to be restated. A restatement is an admission that the restated
5  financial results were not true and accurate. Thus, Mendes directly made the false financial
6  statements which have subjected the Company to potential significant liability. He therefore cannot
7  be disinterested in any demand that the Company sue him for breach of fiduciary duty.

8      83.     In addition, Mendes signed the Company's SEC Form 10-K for the fiscal year ended
9  July 31, 2011 (filed with the SEC on September 15, 2011). Thus, Mendes faces a substantial threat
10  of liability should the Audit Committee's  investigation conclude that the Company's financial
11  statements are unreliable.

12      84.     The Company admits that Mendes is not independent in its SEC filings.

13      **Defendant Neil**

14      85.     Neil is the Company's CFO. As CFO, one of his main responsibilities is to ensure
15  that the Company maintains effective accounting controls and procedures. Neil breached this duty
16  as discussed above and, thus, is not capable of fairly considering a demand that he initiate this
17  lawsuit against himself or his fellow directors. Neil is currently named as a defendant in the class
18  action alleging violation of the federal securities laws. He caused the Company to issue financial
19  statements that he certified, under the Sarbanes Oxley Act, to be true and accurate, but which now
20  will have to be restated. A restatement is an admission that the restated financial results were not
21  true and accurate. Thus, Neil directly made the false financial statements which have subjected the
22  Company to potential significant liability. He therefore cannot be disinterested in any demand that
23  the Company sue him for breach of fiduciary duty.

24      86.     Further, Neil signed the Company's SEC Form 10-K for the fiscal year ended July 31,
25  2011. Thus, Neil faces a substantial threat of liability should the Audit Committee's investigation
26  conclude that the Company's financial statements are unreliable.

27      87.     In addition, Neil's principal professional occupation is his employment with the
28  Company, pursuant to which he received and continues to receive substantial monetary

1   compensation and other benefits.  In fact, in 2010 alone, the Company paid Neil more than $1.8

2   million in compensation.  Given his significant compensation, Neil is incapable of fairly considering

3   a litigation demand.

4       88.    The Company admits that Neil is not independent in its SEC filings.

5       **Defendants Blechschmidt, Zollars and Wolford**

6       89.    Defendants Blechschmidt, Zollars and Wolford are members of the Company's Audit

7   Committee, and Blechschmidt is the Chair of the Committee.  The Audit Committee has been tasked

8   with investigating the wrongdoing alleged herein.  As a result, Blechschmidt, Zollars and Wolford

9   cannot be expected to exercise independence or objectivity with respect to a decision to sue

10  themselves.

11      90.    Moreover, as detailed above, the Audit Committee's charter charges the Audit

12  Committee with reviewing the adequacy and effectiveness of the Company's accounting and internal

13  control policies and procedures.  Thus, Blechschmidt, Zollars, and Wolford were expressly

14  responsible for ensuring that the Company did not have any material weaknesses in its accounting

15  controls.  As members of the Audit Committee, Blechschmidt, Zollars and Wolford approved the

16  financial results which are alleged to be false and misleading and in violation of GAAP.  Having

17  approved the financial results at the heart of this lawsuit and their own internal investigation,

18  Blechschmidt, Zollars and Wolford cannot exercise independence with respect to their own liability

19  and the decision of whether to sue themselves and their fellow directors for wrongdoing centered on

20  the very financial results approved by Blechschmidt, Zollars and Wolford.

21      91.    Blechschmidt, Zollars and Wolford were also responsible for ensuring that all

22  members of the Audit Committee were independent and qualified.  They failed in such duties

23  because, during the Relevant Period, they allowed Silveira to serve as a member of the Audit

24  Committee despite knowledge that he was not independent and that he did not have any

25  sophistication in financial matters or reading financial statements.  This violated the Audit

26  Committee Charter, which explicitly states that: "Each member of the Committee will meet the

27  independence, financial sophistication and experience requirements of the Securities Exchange Act

28  of 1934, the rules and regulations promulgated thereunder by the Securities and Exchange

1  Commission ("***Commission***") and The NASDAQ Stock Market, as they may be amended from time
2  to time ("***Rules***"), except as otherwise permitted by such Rules. Each member of the Committee will
3  have the ability to read and understand fundamental financial statements." Silveira was not
4  independent because he himself was a walnut grower and served in positions of power on
5  cooperatives that included walnut growers who sold walnuts to Diamond.

6       92.    Blechschmidt, Zollars and Wolford also signed the Company's SEC Form 10-K for
7  the fiscal year ended July 31, 2011 (filed with the SEC on September 15, 2011).

8       93.    Moreover, Blechschmidt, Zollars and Wolford face a sufficiently substantial
9  likelihood of liability from their approval of the Company's false financial statements and violation
10 of accounting rules that makes any litigation demand upon them futile.

11              **Defendants Baer, Lea, Gilbert and Warren**

12      94.    Demand is futile and therefore excused as to Defendants Baer, Lea, Gilbert and
13 Warren because these defendants all approved the false financial statements. Indeed, such
14 defendants all approved the proposed acquisition of Pringles by Diamond, first announced on April
15 5, 2011. They knew that this was and is a key proposed acquisition for the Company since, if
16 completed, the acquisition will double Diamond's annual revenues. In a proposed acquisition of this
17 magnitude (approximately $2.4 billion), extensive due diligence and discovery of each company's
18 financial results, operations, and financial projections is undertaken. Such due diligence was
19 performed in 2011, and the results therefor were reviewed by Defendants Baer, Lea, Gilbert and
20 Warren at meetings of the Diamond board during the Relevant Period.

21      95.    Defendant Gilbert, in particular, is an expert in the production and sale of walnuts.
22 Mr. Gilbert, 68, has served as a director of Diamond since 2005 and as Diamond's Chairman
23 Emeritus since January 2010. He served as the Chairman of the Diamond Board from 2005 to
24 January 2010 and was Chairman of the Board of Diamond's predecessor company, Diamond Walnut
25 Growers, from 1996 to 2005. Since 1983, Mr. Gilbert has been the owner and President of Gilbert
26 Orchards and Rio Oso Groves, Inc., each of which is a family corporation focusing on walnuts.
27 Mr. Gilbert holds a B.S. from California Polytechnic State University, San Luis Obispo. He thus had
28 a particular expertise and knowledge of how payments to walnut growers are made, and direct

SHAREHOLDER DERIVATIVE COMPLAINT                                              - 39 -

1 | knowledge that the "momentum" payments in September 2011 that Diamond made to its walnut
2 | growers were not in reality "momentum" payments for walnuts that the growers would deliver in
3 | Diamond's 2012 fiscal year, but instead payments that Diamond should have made to the walnut
4 | growers in its 2011 fiscal year.

5 |      96.    Part of the consideration Diamond is paying for Pringles is comprised of Diamond
6 | stock. Any decreased in Diamond's stock price will make the acquisition less appealing and
7 | valuable to Procter & Gamble. The September 26, 2011 Proxy states the following with respect to
8 | negotiations the parties engaged in with respect to fluctuation in the price of Diamond stock:

9 | "On March 24, 2011, representatives of Diamond and P&G and their respective financial
10 | and legal advisors met in San Francisco to resolve remaining open issues, including the
periods to be used to measure the price of Diamond common stock for purposes of setting
11 | the number of shares of Diamond common stock to be issued in the transaction and the
break-up fee payable by Diamond to P&G in certain events. The parties also agreed to
12 | eliminate the structure that had previously been proposed by P&G involving the possible
issuance of debt securities for the funding of a portion of the purchase price. In exchange,
13 | *the cash collar adjustment applicable if the price of Diamond common stock declined*
*was increased to $200 million*, while maintaining the previously agreed upon adjustment
14 | if the price of Diamond common stock increased at $150 million. P&G and Diamond
15 | agreed to increase the cash portion of the price to $850 million, resulting in a dollar range
of $700 million to $1.05 billion, for a total purchase price of $2.35 billion, inclusive of
16 | the $1.5 billion in Diamond common stock to be issued. The parties also agreed to a
17 | break-up fee amount of $60.0 million."

18 |      97.    Moreover, Diamond is obligated under the merger agreement to assume $850 million
19 | in debt from Pringles. However, the amount of debt that Diamond must assume could rise by as
20 | much as $200 million depending on Diamond's stock price. Thus, Defendants Baer, Lea, Gilbert and
21 | Warren had a strong motive to maintain Diamond's stock price at inflated levels until the acquisition
22 | of Pringles was completed.

23 |      98.    Defendants Baer, Lea, Gilbert and Warren knew that Diamond's financial results
24 | leading up to the merger would be highly scrutinized by Pringle. In order to attempt to keep the
25 | Company's stock inflated, they approved financial results which did not accurately reflect
26 | Diamond's results. All such defendants signed the Company's Form 10-K for 2011. As a result,
27 |
28 |

1 Defendants Baer, Lea, Gilbert and Warren face a substantial likelihood of liability for their conduct.
2 Any demand on them to bring this suit is therefore excused as futile.

3                                    **All Individual Defendants**

4          99.     The acts complained of constitute violations of the fiduciary duties owed by the
5 Company's officers and directors and these acts are incapable of ratification.

6          100.    Any suit by the current directors of the Company to remedy these wrongs would
7 likely expose the Individual Defendants and the Company to violations of the securities laws that
8 would result in civil actions being filed against one or more of the Individual Defendants, thus, they
9 are hopelessly conflicted in making any supposedly independent determination whether to sue
10 themselves.

11         101.    The Company has been and will continue to be exposed to significant losses due to
12 the wrongdoing complained of herein, yet the Individual Defendants and current Board have not
13 filed any lawsuits against themselves or others who were responsible for that wrongful conduct to
14 attempt to recover for the Company any part of the damages the Company suffered and will suffer
15 thereby.

16         102.    If the Company's current and past officers and directors are protected against
17 personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this
18 Complaint by directors' and officers' liability insurance, they caused the Company to purchase that
19 insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of the
20 Company. However, due to certain changes in the language of directors' and officers' liability
21 insurance policies in the past few years, the directors' and officers' liability insurance policies
22 covering the defendants in this case contain provisions that eliminate coverage for any action
23 brought directly by The Company against these defendants, known as, *inter alia*, the "insured versus
24 insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of
25 the Company, there would be no directors' and officers' insurance protection and thus, this is a
26 further reason why they will not bring such a suit. On the other hand, if the suit is brought
27 derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the
28 Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then

1  the current directors will not cause the Company to sue them, since they will face a large uninsured
2  liability.

3       103.    Moreover, despite the Individual Defendants having knowledge of the claims and
4  causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for the
5  Company for any of the wrongdoing alleged by Plaintiff herein.

6       104.    A true and correct copy of the Complaint was delivered to the Company before its
7  filing with this Court.

8                                      **COUNT I**

9       **Derivative Claim Against The Individual Defendants for Violation of Section 14(a)**
10                                **of the Exchange Act**

11      105.    Plaintiff incorporates by reference and realleges each and every allegation contained
12  above, as though fully set forth herein.

13      106.    The Director Defendants issued, caused to be issued, and participated in the issuance
14  of materially false and misleading written statements and material omissions to shareholders that
15  were contained in the Company's Proxy issued on September 26, 2011. The Proxy soliciting
16  materials failed to disclose to the Company's shareholders that the Director Defendants had caused
17  the Company to file false and materially misleading financial statements in the Company's Form 10-
18  K Annual Report for fiscal year 2011. The Proxy Statement included such financial results and
19  incorporated them by reference. The Proxy and the 10-K were false and misleading because they
20  failed to disclose that Diamond deferred approximately $50 million in payments to walnut growers
21  which were due in the 2011 fiscal year until the first quarter of the 2012 fiscal year, thus decreasing
22  expenses and increasing revenues in fiscal year 2011. Indeed, had the payments been made as they
23  should have been in fiscal year 2011, most of Diamond's profits would have been eliminated. By
24  reasons of the conduct alleged herein, the Director Defendants, who caused the issuance of the
25  Proxy, violated Section 14(a) of the Exchange Act. As a direct and proximate result of these
26  Defendants' wrongful conduct, the Company misled and/or deceived its shareholders by falsely
27  portraying the financial results and operations of the Company.

28

1       107.    Plaintiff, on behalf of the Company, thereby seeks relief for damages inflicted upon

2   the Company in connection with the misleading and incomplete proxy materials. Plaintiff also seeks

3   an injunction barring any vote on the merger until after the Defendants correct the Proxy and

4   disclose all material facts regarding Diamond's financial results, operations, and the proposed

5   merger with the Pringles division of Procter & Gamble.

6   **COUNT II**

7   **Derivative Claim For Breach of Fiduciary Duty Against All Defendants**

8       108.    Plaintiff incorporates by reference each and every allegation set forth above.

9       109.    The Individual Defendants owed and owe the Company fiduciary obligations. By

10  reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the

11  highest obligation of good faith, fair dealing, loyalty and due care.

12      110.    The Individual Defendants, and each of them, violated and breached their fiduciary

13  duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

14      111.    Each of the Individual Defendants had actual or constructive knowledge that they had

15  caused the Company to maintain ineffective internal controls. These actions were not a good faith

16  exercise of prudent business judgment to protect and promote the Company's corporate interests.

17      112.    As a direct and proximate result of the Individual Defendants' failure to perform their

18  fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct

19  alleged herein, the Individual Defendants are liable to the Company.

20      113.    Additionally, by their actions alleged herein, the Individual Defendants, either

21  directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

22  duties with regard to prudently managing the assets and business of the Company in a manner

23  consistent with the operations of a publicly held corporation.

24      114.    As a direct and proximate result of the Individual Defendants' mismanagement and

25  breaches of duty alleged herein, the Company has sustained significant damages in excess of the

26  jurisdiction of this Court. As a result of the misconduct and breaches of duty alleged herein, the

27  Individual Defendants are liable to the Company.

28      115.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT III

### Derivative Claim Against Defendants Mendes and Neil for Unjust Enrichment

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    During the Relevant Period, Defendants Mendes and Neil received incentive-based compensation tied to the financial performance of Diamond. Because Diamond's financial results were inflated during the Relevant Period as a result of the wrongdoing alleged herein, Defendants Mendes and Neil received more compensation than they would have received had Diamond's results not been inflated. Therefore, Defendants Mendes and Neil were unjustly enriched at the expense of and to the detriment of the Company.

118.    During the Relevant Period, Defendants knew or should have known that the Company's financial results and performance were artificially inflated due to Defendants' wrongdoing.

119.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from these Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

120.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

////

///

1    **PRAYER FOR RELIEF**

2    WHEREFORE, plaintiff prays for judgment as follows:

3          i.    Awarding plaintiff and Diamond damages and interest;

4          ii.   Awarding plaintiff's reasonable costs, including attorneys' fees; and

5          iii.  Awarding such equitable/injunctive or other relief as the Court may

6    deem just and proper.

7    **JURY DEMAND**

8    Plaintiff demands a trial by jury.

9    DATED:   December 19, 2011                  CHAPIN FITZGERALD
                                                 SULLIVAN & BOTTINI LLP
10

11                                              By: _____

12                                                  Francis A. Bottini, Jr., Esq.

13                                                  Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT                                     - 45 -