Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

In re DIAMOND FOODS, INC. SHAREHOLDER DERIVATIVE LITIGATION ) No. C 11-5692 WHA

San Francisco, California
May 23, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**
CHAPIN FITZGERALD SULLIVAN & BOTTINI
550 West C Street, Suite 2000
San Diego, California 92101
**BY: FRANK A. BOTTINI, ESQUIRE**

**For Plaintiffs:**
ABRAHAM FRUCHTER & TWERSKY LLP
One Penn Plaza, Suite 2805
New York, NY 10119
**BY: LAWRENCE D. LEVIT, ESQUIRE**

**For Defendant Diamond Foods:**
FENWICK & WEST
555 California Street, 12th Floor
San Francisco, California 94104
**BY: DEAN KRISTY, ESQUIRE**

**For Defendants:**
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94104-4506
**BY: ETHAN D. DETTMER, ESQUIRE**

(Appearances continued on next page)

**Reported By:** *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
*Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

**For Defendant Dennis Mussell:**
PROCOPIO CORY HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, California 92101
**BY: SEAN MICHAEL GAFFNEY, ESQUIRE**

**For Defendant Silveira Estate:**
KAUFHOLD GASKIN LLP
388 Market Steet, Suite 1300
San Francisco, California 94111
**BY: STEVEN SHEA KAUFHOLD, ESQUIRE**

**For Defendants:**
ORRICK, HERRINGTON & SUTCLIFFE
405 Howard Street
San Francisco, California 94105
**BY: MIKE TORPEY, ESQUIRE**
**STEVEN HONG, ESQUIRE**

**Reported By:** *Katherine Powell Sullivan, CSR #5812*
*Official Reporter - U.S. District Court*

**P R O C E E D I N G S**

**MAY 23, 2012** **8:10 A.M.**

**THE COURT:** Let's go to Diamond Foods.

**THE CLERK:** Case number on the consolidated lead case of 11-5692.

**THE COURT:** Okay. Appearances, please.

**MR. KRISTY:** Good morning, Your Honor. Dean Kristy of Fenwick & West for Diamond Foods.

**MR. BOTTINI:** Good morning, Your Honor. Frank Bottini for the plaintiffs.

**MR. DETTMER:** Good morning, Your Honor. Ethan Dettmer from Gibson Dunn, on behalf of the independent directors Baer, Blechschmidt, Warren, Wolford, and Zollars.

**THE COURT:** Welcome.

**MR. TORPEY:** Good morning, Your Honor. Mike Torpey and Steve Hong from Orrick, Herrington on behalf of directors Gilbert and Lea.

**MR. GAFFNEY:** Good morning, Your Honor. Sean Gaffney for Dennis Mussell.

**THE COURT:** All right.

**MR. LEVIT:** Good morning, Your Honor. Lawrence Levit for the plaintiffs.

**MR. KAUFHOLD:** Good morning, Your Honor. Steve Kaufhold from Kaufhold Gaskin for the Silveira estate.

**THE COURT:** Thank you. Okay. This is a motion to dismiss. Who would like to speak?

**MR. KRISTY:** I guess I'll lead off, Your Honor. I'll try to keep it brief.

(Reporter interrupts.)

**MR. KRISTY:** It's Dean Kristy on behalf of the nominal defendant Diamond Foods.

Your Honor, as you're aware, our motion presents, really, two threshold issues. One is subject matter jurisdiction, which, in turn, depends on the sufficiency of plaintiffs' claim, the proxy claim under Section 14(a) of the Securities Exchange Act;

And, secondly, demand futility, whether the company and its board should control the company's claim.

**THE COURT:** All I want to hear about is 14(a).

**MR. KRISTY:** Okay. So let me turn right to 14(a), Your Honor.

This is a misleading proxy disclosure claim, according to the plaintiffs. And the relevant proxy is what we call the Pringles proxy. And that concerned a proposed transaction between Diamond and the Pringles division of Proctor & Gamble that was announced in April of 2011.

If that deal had been consummated, the Pringles shareholders would have owned 57 percent of the combined company; the existing Diamond shareholders would have been the

minority shareholders.

The proxy for that transaction was disseminated on September 26, and the shareholder vote was in October. The shareholder vote was in favor of the transaction.

The deal, however, never happened. The deal was not consummated. Instead, it was mutually terminated by Diamond and Proctor & Gamble in February of 2012.

And so the heart of our motion, Your Honor, really concerns whether it makes any sense whether there are legal deficiencies in any claim that involves litigating over misleading disclosures concerning a transaction that never happened. That's sort of at its core.

When we were here last time, on February 16th, at the CMC, I flagged this issue for the Court and I was thinking of it in those terms, in terms of mootness. Why were we going to litigate over this? It never happened.

Maybe the more principled way of looking at that is loss causation. And that's the *Rediker* case that we rely on, Your Honor, in our brief.

What *Rediker* says is that the right to an informed vote -- and that's what they're trying to invoke, the right of an informed vote of the shareholders -- is not adversely impacted when the deal doesn't happen.

Think of it simply. The typical proxy case is there's a misleading disclosure, the shareholders vote to

approve the deal, the deal happens, the deal is bad for the company. That's your standard proxy disclosure case.

Whereas here, there is no deal. It doesn't matter whether the shareholders were deceived or not deceived. And spending the companies' time and money litigating over that issue doesn't make a lot of sense.

That's what *Rediker* holds. What *Rediker* says is you may have a breach of fiduciary duty-type claim arising out of all of that, but what you do not have is loss causation, which is required under Section 14(a).

The Ninth Circuit, in the *Jobs* case, says loss causation is a requirement of Section 14(a).

In their opposition brief, the plaintiffs don't really have an answer to *Rediker*. They bury a little discussion of it in a footnote.

Instead, what they argue is, well, sure there was some damage to the company here, it incurred some expenses in connection with this deal.

For example, the plaintiffs say, there was a registration statement that the company filed with the SEC for the shares that would have been issued, and they spent $250,000, the filing fee for that registration statement.

The problem with that argument is the registration statement isn't the proxy. The registration statement was filed in June. The proxy's filed in September. The

registration statement isn't subject to Section 14(a).

And that filing fee for the registration statement wasn't proximately caused by anything that's allegedly misleading in the proxy. So the registration statement doesn't work.

Their other argument seems to be that there's a small fee that the company incurred in connection with filing the proxy.

They don't really argue this in the brief, but in Mr. Bottini's declaration attaching the proxy, they highlight for Your Honor the $25,000 filing fee that the company incurred.

The problem with that argument is that that's a fee that's going to be incurred regardless of whether the proxy is accurate or inaccurate. It's just the ordinary fee that you incur. It's not proximately caused by anything misleading.

And plaintiffs' own case, which they cite for a different proposition, the *Meldonado* case, holds that precisely that kind of fee if not recoverable under 14(a).

So our first problem is loss causation. And that's part of our argument.

The second argument we have with respect to 14(a) concerns a separate and independent element of the claim, which is that the plaintiffs have to show that the misleading proxy is an essential link in the accomplishment of the proposed

transaction. That's a Ninth Circuit requirement.

There's material misstatement, essential link, and state of mind requirements; three independent elements.

Well, we haven't found any case, and the plaintiffs haven't cited any, which establishes that the essential link requirement in the accomplishment of a transaction can be satisfied when there's no transaction.

Again, there's a difference between a disclosure claim under Section 14(a) and what you might get, and some breach of fiduciary duty claim. They can pursue whatever claims they want on breach of fiduciary duty. This isn't a 14(a) claim.

And then lastly, Your Honor, is the materiality point. And I must say that at a lot of levels this is a little counterintuitive to what you normally think about. But it's really based on Judge White's decision in the *McKesson* case.

In *McKesson*, that was a merger between McKesson and HBOC. And in their proxy statement that went out, HBOC's financial results had been inflated by hundreds of millions of dollars, $327 million of revenue that was recognized, reflected on those books in the proxy, which was inaccurate. Those financials had to be restated.

And what Judge White held in that context is those couldn't be material to HBOC's shareholders because if the truth had been revealed, if the results had been lower for

HBOC, it would have, if anything, garnered even greater support by HBOC shareholders for the proposed deal.

And that's where Judge White wrote this. He said, quote:

"In the proxy context, the definition of 'materiality' assumes that the omitted information would have influenced a reasonable shareholder against -- against the proposed transaction for which the proxies were sought."

Here, in our case, the plaintiffs allege that the Pringles deal would have been beneficial to the company. There is no allegation in the 216-paragraph complaint -- and I read it again this morning -- no allegation suggesting that the shareholders would have voted against the transaction had the lower financial results been reported. Quite the opposite.

Here's what the complaint says in the most relevant portion, paragraph 107:

"Diamond has lost the substantial benefits that were to come from the Pringles transaction, which, among other things, was going to transform Diamond into the second largest snack food company."

What they're complaining about in the piece is that we lost the deal. Not that the deal got approved and somehow

harmed the shareholders; that we lost it. And that's *McKesson HBOC*.

And in this context -- and context is key --

**THE COURT:** But in *HBOC*, the deal went through.

**MR. KRISTY:** It did. It's even -- it's even a --

**THE COURT:** In this case it did not go through.

**MR. KRISTY:** Yeah, so it --

**THE COURT:** So reconcile those two circumstances.

**MR. KRISTY:** Sure. It makes *HBOC* -- it makes our case even better than *HBOC*. In *HBOC*, you could at least understand shareholders approved the deal, that it went through.

Here, there's -- there's no deal. It's hard to complain. You had those other elements of a claim satisfied in *HBOC*, where you don't have them here. So this is an even more compelling case.

The real key at the end -- I know it can get a little confusing and it's a little bit of an odd notion, but Judge White really had it spot on when he said, look, context is key.

And here, in this deal, Diamond shareholders would have owned a minority position in the combined company. If Diamond was doing less well than what the shareholders believed, that makes it an even better deal, not a worse deal. It makes it a better deal for Diamond shareholders.

And in that context you can't have a 14(a) claim. You might have something else. But you can't have a 14(a) damage claim. That's what *McKesson HBOC* holds.

So that's kind of my spiel on the proxy. The bottom line is kind of this from the company's perspective, is this is kind of a truly extraordinary kind of proxy claim. You have an allegedly misleading proxy for a deal that never happened. The shareholders are complaining that the deal should have happened.

And it just doesn't make any sense, from our perspective, to be litigating that kind of claim and take up Your Honor's time with that sort of claim.

This is a breach of fiduciary duty case over accounting for walnut payments. That's what we should be litigating about, not litigating about this.

Thank you, Your Honor.

**THE COURT:** All right. Thank you.

Let's hear from plaintiffs.

**MR. LEVIT:** Thank you, Your Honor. Lawrence Levit for the plaintiffs, from Abraham, Fruchter & Twersky.

I'll try to answer all of defendant's points. The first one is on damages. And here, as we clearly state in both our complaint and in our memorandum, there are damages that were incurred by the company once the shareholders voted on the transaction by way of a proxy statement.

And just to list some of the types of damages, once there was approval given by the shareholders, the company then had expenditures for integrating -- planning the integration of Pringles into Diamond.

As we say in our complaint, the company stated that those integration expenses could be up to $150 million. They obviously incurred those expenses once approval was given by the shareholders. So for defendants to say there were no damages to the company based on that approval of the proxy is just not true.

Beyond that, there were certainly advisor fees that the company expended for financial advisors, attorneys --

**THE COURT:** Well, you just said something that made me -- did the Diamond shareholders -- the 14 -- the proxy was sent out by who?

**MR. LEVIT:** Was sent out by Diamond.

**THE COURT:** And that was to approve the merger, right? The acquisition?

**MR. LEVIT:** It was to approve -- it was actually, technically, to approve the -- the issuance of additional Diamond shares, but it was in connection with the Pringles transaction.

**THE COURT:** And was that done?

**MR. LEVIT:** Yes -- well, the approval was given. The shares were not issued because the transaction was never

consummated.

**THE COURT:** And it wasn't consummated why?

**MR. LEVIT:** It was --

**THE COURT:** Pringles backed out; is that it?

**MR. LEVIT:** From what we understand, it was a mutual agreement because of the walnut payments were accounted for improperly. And it was a mutual agreement not to go forward with the transaction.

**THE COURT:** So what do you say to the Judge White decision in *McKesson*?

**MR. LEVIT:** What I say to that is that it's a different type of situation. In that case, there was no question about the transaction being beneficial to the harmed shareholders because the deal there was a set ratio. We don't have that in our case here.

Here, the amount of debt that Diamond would take on was dependent on its share price. If the price was high, as it was when the share -- when the proxy was voted on, the debt amount that Diamond would take on was lower. It was potentially as low as $700 million.

When the share price fell, Diamond would then have to take on over a million in debt, a million-50 in debt. So that's a $350 million difference. It's a 50 percent increase in the amount of debt Diamond was taking on because its share price fell.

Now, the Diamond shareholders, if they saw this huge amount of additional debt, were -- I mean, we could say that it was certainly important information that would influence how they would vote. And, you know, that's the standard for materiality, obviously.

So the additional debt makes this different from the *McKesson* case because here Diamond shareholders --

**THE COURT:** But did the debt materialize?

**MR. LEVIT:** I'm sorry?

**THE COURT:** Did the debt actually get put on the books?

**MR. LEVIT:** Well, it would have been if the transaction had gone forward. But it was --

**THE COURT:** But it didn't go forward. So why isn't the whole thing moot? That's the part I'm having trouble with.

**MR. LEVIT:** Well, it's not moot and -- and we cite various cases in our memorandum.

**THE COURT:** Well, give me your best one and describe what do you think is the closest Ninth Circuit decision that requires your 14(a) claim to go forward.

**MR. LEVIT:** Well, I think the closest Northern District of California case is the *Wininger* case. And in that case, the transaction also did not go forward. And the 14(a) claim was allowed to proceed because there were damages incurred in connection with that transaction.

So even though the transaction did not get consummated, even though defendants argued that the claim was moot, there was a valid 14(a) claim, because once you have false and misleading material proxy statement and you have damages, that's really all you need to have a valid 14(a) claim.

**THE COURT:** How does this statute read in terms of what damages can be collected?

**MR. LEVIT:** It's not crystal clear on that. It's, essentially, any damages that you could show were in connection with your claim or the transaction or what you're alleging. Here, the transaction didn't go through, but we have valid types of damages that are recoverable.

I mean, the *Wininger* case, the *CNW* case say that expenses -- in our case, the company's expenses are recoverable. In those cases it was individual plaintiffs, but -- the *Meldonado* case is another case that states that expenses are recoverable in this situation.

I mean, these are -- these are expenses that Diamond would not have incurred if not for the shareholders voting for approval of the transaction based on the proxy statement. If the shareholders had voted no at that time, then the expenses we were seeking to recover would not be -- would not have been incurred by Diamond.

**THE COURT:** And what were the expenses that occurred

after the shareholder vote to approve the deal?

**MR. LEVIT:** The ones that we believe are the expenses that were incurred by the company planning for the integration of Pringles into Diamond, which the company was trying to accomplish by the end of 2011. So that gave them approximately a two-and-a-half-month window to try to finalize that transaction and integrate the Pringles division into Diamond.

There were also, in connection with that, fees that Diamond incurred. I would imagine there are financial advisor fees and attorneys' fees.

Then, of course, once the determination was made not to go forward with the transaction, there were fees incurred by Diamond in unwinding all these activities and canceling the transaction.

And there were SEC filings. There were, of course, additional professional fee expenses.

And those expenses would not have been incurred by Diamond if the shareholders had not voted their approval.

**THE COURT:** All right. Let me ask the other side this point. What do you say to that point, that you put out a proxy statement that was false and misleading; the shareholders, in fact, did rely on it, and approved the deal; the deal eventually didn't go through, but, in the meantime, to pursue that deal that was approved by the shareholders, money was spent? So what is your answer to that argument?

**MR. KRISTY:** My answer to that is that what they've pleaded doesn't meet *Jobs's* -- the Ninth Circuit standard for proximate causation and loss causation.

They talk about integration costs. That's sort of now the real lead argument on what the expenses were, but there's no allegation in the complaint that says integration costs just started after the shareholders voted to approve the transaction.

**THE COURT:** Well, some costs had to be incurred. I'm willing to accept the proposition that after the shareholders voted there were some costs that were incurred that would not have been incurred if the deal had been voted down. Surely that has to be true. So assuming that that's the case, what do you say to that as a legal matter?

**MR. KRISTY:** As a legal matter, you still have all the other deficiencies in the 14(a) claim. You don't have an essential link in connection with the consummation of the transaction. You don't have materiality because the plaintiffs are not alleging that the shareholders would have voted no.

Their fundamental problem is that they're backing away from what they really say in their complaint. Paragraph 107 says, great deal, we wanted the deal. Not that, we would have voted it down.

This new explanation about the debt levels isn't in their complaint, point one; and, point two, doesn't make a lot

of sense. The debt that the proxy discloses -- and it's right there, it's before the Court, it's in the record -- shows that the company was going to incur $850 million of debt in connection with the deal.

It had a collar mechanism. And that was based on a share price -- a little complicated formula, but the bottom line was think of it as the share price at the time of the deal, $52. Okay. Fifty-two dollars means we get $850 million of debt.

If our share price goes down, it goes down to a dollar, goes all the way down, the most debt we will incur is a billion dollars. If the share price goes up, we might incur as little as $700 million, no matter high it goes. It goes to $800, it's still $700 million.

So there's a band there, and the shareholders know that. It's disclosed to them. And the shareholders vote to approve the deal.

And the only allegation we have in the complaint is that it was a great deal. There isn't anywhere in that complaint -- I read all 216 paragraphs sitting in the cafeteria again this morning. 80 pages long. Not once does it allege the shareholders would have voted no. Just isn't there. And that has to be the fundamental --

**THE COURT:** Let me go back to -- let me see if I've got your main materiality point. We have to assume for

purposes of argument that the 14(a) was misleading and that it overstated the worth of Diamond Foods, right?

**MR. KRISTY:** Correct, Your Honor, for purposes of argument, yes.

**THE COURT:** For purposes of argument. But your point is that if the truth had been known, this would have been an even better deal for the Diamond shareholders, for the Pringles deal to go through. And, therefore, the fraud that was committed made the Pringles deal less attractive, in a way. Is that it? Is that your argument? Say it in your own words.

**MR. KRISTY:** In my own words -- I'll use Judge White's words because it's easier for me. That could not have been material, at the end of the day, to the shareholders in deciding whether to vote for or against the deal. Judge White says this. For the misstatement to be material in the proxy context, you have to show that it would influence people to vote against the deal.

Here, where it makes Diamond less valuable, the only reasonable inference, the one that Judge White reached in the *HBOC* context, was to say this, if anything, would have garnered even greater support for the deal. And there's some other cases that then cite *McKesson* later on.

If I may, Your Honor, just one brief other point, which is you asked them give us your best Ninth Circuit case on why they have a claim here. And they cited --

**THE COURT:** What is your response?

**MR. KRISTY:** The *Wininger* case and *CNW* are completely different. In *Wininger*, you have a misleading proxy statement, but the expenses that are incurred and recovered are the expenses of the plaintiff who had to respond to the misleading proxy. Think of it as a proxy contest between two insurgents. The defendants put out a misleading proxy, and the plaintiff now has to respond to the misstatements in there. So they're incurring expenses proximately caused by that misstatement. Much different case.

Likewise, to the extent that the defendants ever incurred expenses, the expenses the Court awards are the ones for the resolicitation of the proxy.

So, for example, Your Honor, let's assume in our scenario that the deal had not been terminated but, instead, the deal was still viable, but because there were misstated financials in the proxy, Diamond had to resolicit all of the shareholders for the proxy.

In that scenario, *Wininger* would say the resolicitation expense, yeah, that's proximately caused by the original misstatement. Not your original filing fees, because you had to incur those anyway. And that's the *Meldonado* case, which they also cite, which says you don't get that. If there's a resolicitation, I get it. Misleading proxy leads to resolicitation. Those expenses are recoverable.

**THE COURT:** What would be the remedy then, in your view, assuming that there was a fraudulent statement, assuming that these shareholders relied on it to approve the deal, and expenses were then incurred by the company in anticipation of what turned out to be a canceled acquisition?

For those interim expenses, what would be the remedy of the plaintiffs to recover that?

**MR. KRISTY:** I think they can bring a damage claim for breach of fiduciary duty, but they have to prove --

**THE COURT:** A derivative claim.

**MR. KRISTY:** A derivative claim in that context, yes. You would have to go through all the requirements to bring that claim. But it's not a wrong without a remedy in theory. It's just not a remedy that 14(a) provides. And that's kind of the point that we're trying to underscore here.

**THE COURT:** All right. I want to give the plaintiff the last word --

**MR. KRISTY:** Thank you, Your Honor.

**THE COURT:** -- and then we'll bring it to a close.

**MR. LEVIT:** Your Honor, as far as standard goes, it's -- we don't have to show that the shareholders would have voted no based on the false information being known to them or voted any -- any particular way. The standard is whether it would have been important information for the shareholders to determine how to vote.

And here where the debt that Diamond would incur could potentially go from 700 million to a billion-50 is certainly information that would have been important in determining how these shareholders vote.

The Diamond shareholders would continue to be shareholders of Diamond, so it's in their interest to not have the company incur this significant additional debt. And that is -- is something that would have influenced how a shareholder would have decided to vote. And that's what we have to allege here.

And as the *Gaines* court says -- it's a Ninth Circuit decision -- causation is assumed once materiality is satisfied. I think we've met that standard here.

As for the type of damages that are recoverable, 14(a) is very flexible. You don't have to state -- courts, as we stated in our memorandum, have said you don't have to list every particular type of damages that you intend to try to recover under 14(a).

Here we've listed several different types of damages that were incurred. The company incurred them. It's a derivative action brought on behalf of the company. The company has a right to try to recover those expenses it would not have incurred if not for the vote. That is all that 14(a) requires, and that's -- that's what we allege.

**THE COURT:** All right. Thank you.

**MR. LEVIT:** Thank you, Your Honor.

**THE COURT:** Under submission. I don't have an answer right now. It's an interesting problem.

Just while I've got you here, what is the next big event in this case? Remind me what that is.

**MR. KRISTY:** Your Honor, I don't think there's anything on the -- on the calendar. Obviously, in the related class action, there's -- you're in the lead counsel process. But in this case, other than getting Your Honor's ruling on this motion, there's nothing currently scheduled.

**MR. BOTTINI:** Your Honor.

**THE COURT:** Yes.

**MR. BOTTINI:** May it please the Court, Frank Bottini for the plaintiffs.

What Your Honor may have been alluding to is the defendants brought an administrative motion for relief when they asked to, in essence, bifurcate the motions to dismiss. And Your Honor granted that and denied it -- granted in part and denied it in part.

So you ruled that the demand futility issue and the jurisdictional issue with respect to the proxy claims would be heard today, as they have been. We haven't spoken about demand futility, but you've told us, I guess, you don't want to hear about that.

**THE COURT:** 14(a) is the main thing I'm interested

in.

**MR. BOTTINI:** And then you said after Your Honor rules on that then you'll set another schedule for any motions that the individual defendants may want to bring. So that's sort of the next step in the case, I think.

And I would like to point out one other thing on the jurisdictional issue that Your Honor has heard this morning, which is we mentioned in papers, briefly, that if for any reason Your Honor determines that there's not a proxy law claim, we still have -- believe we can proceed here on a diversity basis.

So plaintiff Hialeah is diverse and can assert federal jurisdiction based on diversity.

**THE COURT:** Is that pled in the complaint?

**MR. BOTTINI:** I don't know if it's pled or not. I think we do plead where the plaintiffs are citizens of and --

**THE COURT:** You think or you know?

**MR. BOTTINI:** Well --

**THE COURT:** Somebody over there said they've read the complaint in the cafeteria.

**MR. BOTTINI:** No, no.

**THE COURT:** What are the jurisdictional allegations of the complaint?

**MR. BOTTINI:** Plaintiff Hialeah is diverse and plaintiff --

**THE COURT:** No, no. It's what's in the complaint that matters.

**MR. KRISTY:** Section 1367, Your Honor, purely supplemental jurisdiction for the state law claims. And this is not even flagged in the opposition. This is new argument he's offering here. There's --

**THE COURT:** I'm not going to hear this. You're trying to reopen something. The argument is closed. So that's not going to be permitted. Thank you.

**MR. KRISTY:** Thank you, Your Honor.

(At 8:41 a.m. the proceedings were adjourned.)

\- - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, June 18, 2012

s/b Katherine Powell Sullivan

Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter